UNITED STATES of America, Appellee,

v.

Rudy Yujen TSAI, Appellant.

No. 91–1202.

United States Court of Appeals,
Third Circuit.

Argued July 31, 1991.

Decided Jan. 21, 1992.

Rehearing Denied March 17, 1992.

Michael M. Baylson, U.S. Atty., Walter S. Batty, Timothy R. Rice (argued), Philadelphia, Pa., for appellee.

Peter Goldberger (argued), Pamela A. Wilk, Philadelphia, Pa., for appellant.

Before BECKER, SCIRICA and ROTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Defendant Rudy Yujen Tsai was convicted by a jury of three counts of violating and one count of conspiring to violate the Arms Export Control Act ("AECA"), 22 USC § 2778(b)(2) and (c) (1988). The conviction stems from defendant's part in a conspiracy to export to Taiwan certain components of military equipment without the required export license. Defendant was sentenced by the district court for the Eastern District of Pennsylvania pursuant to the United States Sentencing Commission Guidelines ("the Guidelines" or "USSCG"), and he appeals from the judgment of sentence.

Defendant challenges the conviction itself by arguing that (1) the evidence was insufficient to establish that the infra-red domes alleged to have been illegally exported in Count Three of the indictment were items for which an arms export license was required and that (2) the district court erred in its definition of willfulness in a supplemental charge to the jury. We reject both of these claims. We are satisfied that the government's case was sufficient to support the jury's verdict. We also conclude that the court did not commit plain error when it supplementally instructed the jury that it was sufficient for conviction to find that defendant knew that he could not export the particular item. This is so even though the court's initial instruction implied that defendant had to know specifically about the export license requirement. Because we reject these claims, we will affirm the conviction.

Defendant also challenges his Guidelines-based sentence on several grounds. We reject defendant's contention that the government failed to prove that "sophisticated weaponry" was involved in this case and therefore hold that the district court properly raised the Guidelines offense level from 14 to 22. However, we agree with the defendant that the district court failed to justify its large upward departure from the Guidelines offense level that the district court found applicable under the facts (level 24) to the equivalent of level 29. We reach this conclusion because the facts found at the sentencing hearing placed the offense within the Guidelines "heartland" for AECA, thus rendering departure inappropriate. Consequently, we will vacate the judgment and remand for resentencing.

■ The defendant has also argued that even though he was found to be a manager or supervisor in the criminal scheme for which he was convicted, justifying a two-level upward adjustment, see USSCG § 3B1.1(c), he could still qualify as a "minor participant" in the offense, justifying an offsetting two-level downward adjustment. See USSCG § 3B1.2. The government views this position as illogical. We disagree. While we intimate no view on the factual aspects in this matter, we hold that the two adjustments are not logically inconsistent and that, on remand, the district court should determine whether there is any basis for defendant's contention that he was a minor figure because he was merely carrying out instructions from others.[1]

---

1. We shall not dwell at length upon defendant's contention that the district court abused its discretion in not ordering a local medical study to evaluate the degree of disability remaining from defendant's childhood polio and the likely effect on him of long-term incarceration without rehabilitative care. Defendant still wears a leg brace and, in his view, the results of such a study were necessary to determine whether there existed any unusual mitigating factors that might justify a downward departure, or that might temper any upward departure. The district court had extended contact with defendant throughout a four-day trial as well as during the other proceedings in the case and was in a position to evaluate the need for a physical examination. The district court specifically stated that it did

not find defendant's condition "extreme." Under these circumstances, we cannot say that the district court abused its discretion in not ordering a local study.

We do note for the benefit of the district judges within this Circuit that Congress has clearly authorized the conduct of local studies (in contrast to medical evaluations at the Bureau of Prisons medical facility in Springfield, Missouri to which defendant was in fact sent after his incarceration) in cases where medical information will be useful in determining the sentence to be imposed. Virtually all the district courts within this Circuit hold court in places where there are ample resources for the conduct of such local studies, and the United

## I. THE RELEVANT FACTS OF RECORD

The relevant facts, viewed in the light most favorable to the government, see *United States v. Gonzalez,* 918 F.2d 1129, 1132 (3d Cir.1990), may be summarized as follows. Defendant, a Taiwanese-born, naturalized American citizen, the defendant's brother, Tommy Tsai, and Dr. David Rosen were involved in an enterprise known as TRT International Corporation ("TRT"), headquartered in Boston. Tommy Tsai founded TRT, apparently in part to facilitate the illegal export of weapons to Taiwan. In 1987, Tommy Tsai began working from Taiwan, and defendant began directing export of the weapons from the United States. As part of the scheme, defendant instructed Rosen to represent himself falsely to suppliers of military equipment as a doctor of engineering and as TRT's director of research. This was part of TRT's plan to procure United States military technology for export to Taiwan. Defendant would receive facsimile ("fax") messages from Taiwan and instruct Rosen which military technology to obtain based on the information contained in the messages.

In early 1987, Rosen, at defendant's direction, began searching for DSU-15 optical receivers, which are prisms used in the proximity fuse of the guidance system of the 9-M Sidewinder, an air-to-air missile. Rosen located Pennsylvania Optical Company, a defense subcontractor in Reading, Pennsylvania, and at defendant's direction sought quotations for prices on behalf of TRT for 5,000 optical receivers.

In March 1987, Rosen purchased from TRT ten of these optical receivers, and shipped them without an export license to the Chung Shan Institute of Science and Technology in Taiwan, the top military research center of the Taiwanese government. They were paid for by a check signed by defendant. Taiwan had sought to obtain the DSU-15 optical receiver through official channels, but the United States had refused to release the technology.

Next, defendant obtained specifications from Chung Shan for the purchase of infra-red domes. The infra-red dome apparently serves as a "windshield" for the guidance of infra-red military missile systems such as the Sidewinder missile or the Maverick missile. The domes were to be manufactured to military missile specification. Rosen gave the dome specifications to Pennsylvania Optical. Suspicious that TRT was illegally shipping defense articles to Taiwan, Pennsylvania Optical notified United States Customs. As a result, the Customs Service placed an undercover agent at Pennsylvania Optical posing as a salesman handling the TRT account.

Around the same time that the agent was installed, defendant contacted Pennsylvania Optical to request delivery of the infra-red domes. There was evidence that during the next year, defendant exported three infra-red domes and an additional DSU-15 optical receiver to Taiwan.[2] Defendant used a system of falsifying shipping documents and letters of credit to smuggle the defense articles through Customs. Evidence at trial suggested that the domes were defense articles. The government produced John Shepherd, head of the office of Advanced Development for the Sidewinder missile system at the U.S. Naval Weapons Center in China Lake, California, who testified that the infra-red domes were critical to operation of a missile. Based on factors such as flight velocity, wave-length transmission, and flight altitude, he opined that the dome specifications supplied by defendant were military and not commercial in nature. In an exchange relied on by defendant, when Shepherd was asked if the dome was for a military missile, he replied, "Yeah, I would think so."

Additionally, Michael Danis, an advisor to the President on the missile systems of

---

States Probation Offices within the Circuit are all knowledgeable about how to make the necessary arrangements.

**2.** The additional optical receiver was delivered by an undercover Customs agent on January 31, 1989 and, according to defendant's statement to Rosen, was taken by defendant's girlfriend to Taiwan.

China and Taiwan, testified that the infra-red domes manufactured by Pennsylvania Optical at defendant's request "would be used on infra-red guided missiles, a missile such as the AIM–9M [Sidewinder] or air-to-surface missiles such as the AGM–65 Maverick missile." Danis added that Taiwan is attempting to develop similar infra-red domes for use in its missile program. The government also produced a Department of State certification that the infra-red domes required a license for export pursuant to 22 USC § 2778.

Defendant claimed at trial, however, that he believed that export of the domes did not require a license because the dome was of custom design and was not part of a United States military weapons system. According to defendant's evidence, the domes have multiple uses. Although they are similar to those used in the infra-red Maverick Missile, they are not identical, and may have been for some other kind of missile. Also, as Rosen testified, the domes can be used for "fleer systems" on helicopter mount support, i.e. on units mounted on platforms atop a helicopter for identification of aircraft. However, the government adduced evidence that defendant knew that he needed an export license to export these items. A Pennsylvania Optical official told defendant that the infra-red dome required a license. So apparently did Rosen, at least on one occasion. Rosen testified that he "knew that export licenses were needed for the domes," and that he had discussed the need for a license with defendant.

Moreover, defendant made a number of damaging statements in taped conversations with the undercover agent. He said that he would have to apply for an export license, and he told the agent that they should both "act dumb" about the need for a license so that he could always claim ignorance on the subject. The agent then sent defendant a letter detailing the need for the export license.

Defendant sought to exculpate himself by explaining that he was acting under time constraints because of the imminent shipping date for the domes and of the covering letter of credit. He also testified that he thought that the Customs Service would return the items if they were not exportable, since the package was accurately labeled. The jury obviously was not swayed by these arguments (or by defendant's other arguments) and found defendant guilty on all four counts. This timely appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONVICTION ON COUNT THREE

■ Defendant argues that the proof presented by the government at trial was insufficient as a matter of law to establish violation of AECA as charged in Count Three of the indictment because the evidence was unclear as to whether the infra-red domes exported on November 22, 1988 were "defense articles" within the meaning of 22 USC § 2278(b). AECA makes it unlawful to violate "wilfully" any provision of AECA or any rule or regulation issued under it. See 22 USC § 2278(c) (1988). Section § 2778(b)(2) prohibits the export of "defense articles" that have been so designated by the President. The Munitions List, contained in 22 CFR § 121.1 (1991), was promulgated pursuant to 22 USC § 2778(a)(1) and lists twenty-one categories of weapons whose export is prohibited without a license. Category IV(h), the only one on which the jury was charged, includes "all specifically designed or modified components, parts, ... [and] accessories ... for the articles in this category." The category includes launch vehicles, guided missiles, rockets, torpedoes, and mines.

We have set forth in Part I the facts bearing on defendant's legal sufficiency argument. We apply the familiar standards that, in this context, the facts must be viewed in the light most favorable to the government and the conviction cannot be set aside unless the facts adduced were insufficient to permit the jury to find the defendant guilty beyond a reasonable doubt. See *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir.1990); *Government of the Virgin Islands v. Williams*, 739 F.2d 936, 940 (3d Cir.1984).

Defendant argues that the evidence was insufficient on the question whether the infra-red domes were "missile parts," a characterization that would place them within the regulations promulgated pursuant to AECA. Defendant highlights the countervailing evidence he offered at trial that the domes were to be used on helicopter fleer systems. In his sharpest thrust, defendant states:

> "Similar" items, whatever that may be, particularly if they are "fleer systems" for helicopters, are not listed missile components, as alleged, and Shepherd['s] somewhat tentative acquiescence to a leading question, containing a premise not found elsewhere in his testimony (that the domes were for a missile), cannot carry the government's burden beyond a reasonable doubt.

Defendant characterizes Shepherd's confirmation that the domes were missile parts ("Yeah, I would think so") as "somewhat weak."

Although the question focused on by the defendant was leading, defense counsel did not object and the question stands. While Shepherd's response was less than authoritative, the answer was not stricken, and the evidence was before the jury to believe or disbelieve. Moreover, there was other testimony by Shepherd and by Danis that directly linked the domes to missiles. This evidence, coupled with the State Department certification, was more than sufficient to establish defendant's need for an export license. Finally, the evidence of statements to defendant by Rosen and by the Pennsylvania Optical officials, and the statements by defendant on the undercover tape supplied sufficient evidence of defendant's knowledge of the requirement. Under the applicable standards of review, there was sufficient evidence to uphold the conviction on Count Three.

## III. THE JURY CHARGE

■ The AECA violations with which defendant was charged in Counts Two through Four require a showing of willfulness. See 22 USC § 2778(c). In its original jury charge, given in accordance with the tenor (though not the precise terms) of the government's own request for instructions, the district court made it clear that the jury must find that the defendant knew that an export license was required.[3] In a supplemental instruction, given in response to a juror's question, however, the court arguably diluted the original instruction and told the jury that what it had to find was that defendant knew that he could not export that particular item.[4]

Defendant maintains that the supplemental charge was confusing in light of the original charge because it altered and "lessened the proof required of the government on the intent element, without directing the jury's attention to the charge." Defendant also complains that the court used the word "basically" twice in its answer and that it also said "what it comes down to." The defendant translates these locutions into the use of "inexact words" that failed to give the jury "concrete" guidance, and "implicitly encouraged the jury not to be overly concerned with the elements of the offense." Finally, defendant

---

3. In relevant part the court stated:

> Now, as I said, the first element is that the defendant must have exported or attempted to export or caused to be exported from the United States of America an article or article listed on the U.S. Munitions Control List. The government must show that the defendant knew that the export was illegal, but it does not have to show that he knew all of the specifics of the law or was a lawyer or ever read the law or even the U.S. Munitions List. All they have to show with regard to the Arms Export Control Act and the regulations—all they have to show is that he was aware from whatever source that a license was required.

4. The court answered the juror's question as follows:

> Now, I think I told you I charged you that you should consider all the evidence and any inference that fairly and honestly arises from the evidence, consider all of it; and based upon that you must find that from whatever source that he knew that he could not export it from the country, basically. You do not have to find that he knew all the details of the law, but you do have to find—it has to be intentional—that is, he has to know that he cannot export that particular item from the country is basically what it comes down to. [JUROR WHO ASKED QUESTION] Okay.

asserts that the supplemental instruction was an inaccurate statement of the law that prejudiced the defendant.

Because no objection was interposed to the supplemental instruction, defendant argues that it constituted plain error. Under our jurisprudence, plain error occurs only when there is "egregious error or a manifest miscarriage of justice." *United States v. Thame*, 846 F.2d 200, 204 (3d Cir.1988). We address each of defendant's objections under this standard.

Defendant's objection to the supplemental charge is couched against his background citation to *Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946), in which Justice Frankfurter wrote:

> Particularly in a criminal trial, the judge's last word is apt to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptionable and unilluminating abstract charge....
>
> ... Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.

326 U.S. at 612–13, 66 S.Ct. at 405.

Defendant contends that the court failed the rigorous *Bollenbach* test, and did not exercise a duty of "special care" in responding to a request for "further light on a vital issue" from a confused member of the jury. The government responds that the court initially gave a detailed explana-

tion of the willfulness element required to establish specific intent to violate § 2778, see note 3, and that the court never nullified this trenchant charge but merely refocused it in a manner relevant to the jury issue.

■ Whatever may be said of defendant's contention in another context, we cannot say that the supplemental charge constitutes plain error on grounds of confusion or imprecision. While it would have been preferable for the court to have been linguistically consistent in the original and supplemental instructions, the differences between the two versions of the instructions were not functionally significant, and certainly did not create a fundamental miscarriage of justice notwithstanding that the supplemental charge was of heightened importance because of its timing. Nor was the district court insufficiently precise because it used the word "basically" and the phrase "what it comes down to." Responses to a juror's question are generally extemporaneous and ad hoc, and cannot be expected to be delivered in polished prose. The district court's choice of words was understandable and acceptable.[5]

■ Defendant's most substantial objection to the supplemental charge arises from his contention that the charge lessened the proof requirement of the statute. Defendant submits that the statute requires proof of his knowledge of the licensing requirements, and not merely of his knowledge that exporting the items would be against the law. Defendant argues that the jury may have applied this "lesser proof" standard to all the counts.

The statute provides in relevant part:

---

5. Nor are we impressed with the defendant's insinuation that there was error because the court (and both counsel) misunderstood the juror's question. The juror asked:

> I am having a problem with count three with if Rudy was not sure about getting an export license. Does that show him as guilty? Even if you say that he was not absolutely sure he needed a license, I know he was told by Major Instruments that he needed an export license. Explain to me or help me on my confusion.

Defendant argues that by limiting his question to Count Three, which concerned the infra-red domes, what the juror was really asking was whether the government had to prove that the defendant knew the domes were "defense articles" on the United States Munitions List even though they were made to unique specifications and were not identical to any existing missile. We think the district court's interpretation as plausible as that of the defendant. Even if not, we do not believe that a supplemental charge that is non-responsive to the juror's question constitutes plain error.

(c) Criminal violations; punishment. Any person who *willfully violates any provision of this section ..., or any rule or regulation issued under [this] section ...* shall upon conviction be fined for each violation not more than $1,000,-000 or imprisoned not more than ten years, or both.

22 USC § 2778(c) (emphasis added).

The incorporated statutory provision with which violation defendant was charged states, in relevant part:

(b) Registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services; exceptions....

(2) Except [for irrelevant exceptions], no defense articles or defense services designated by the President under subsection (a)(1) [the Munitions List] may be exported ... without a license for such export, issued in accordance with this Act and regulations issued under this Act, except [for irrelevant exceptions].

22 USC § 2778(b)(2).

The defendant relies on a Second Circuit opinion, *United States v. Jamil*, 707 F.2d 638 (2d Cir.1983), which also construed these provisions, to bolster his position. However, that case was decided on an evidentiary issue, not on one relating to the correctness of the charge.[6] The other cases on this issue favor the government. See *United States v. Murphy*, 852 F.2d 1, 7 (1st Cir.1988) (rejecting argument that the defendant must know of the licensing requirement or presence of the article on the Munitions List, and holding that willfulness under AECA means that " 'defendant must know that his conduct in exporting from the United States articles proscribed by the statute is violative of the law' "); *United*

States v. Beck*, 615 F.2d 441 (7th Cir.1980) (same).[7]

Defendant argues that *Murphy* and *Beck* are incorrectly decided and that we should not follow them. In essence, he argues that the statute's plain language requires the government to prove that defendant knew that a license was required, not merely that export would be contrary to law. He also asserts that it would be impossible for a defendant to "willfully violate" a statute of which he was unaware.

The district court might have better instructed the jury had it instructed both times as the defendant suggests; as noted, its initial instruction was of that tenor. But we think it an excess of formalism to suggest that there is a functional difference between the two charges. If the defendant knew that the export was in violation of the law, we are hard pressed to say that it matters what the basis of that knowledge was. There may be some cases in which one approach will fit better than the other. Certainly knowledge of the licensing requirement will likely be the focal point in most cases, rendering the dispute somewhat academic. But we think that the court did not err in instructing the jury that it could convict if it found that defendant knew that the export was illegal. See *Murphy*, 852 F.2d at 7. Thus, we conclude that the district court's supplemental charge was not error, and consequently we hold that it was not plain error.

## IV. THE SENTENCING ISSUES

### A. *Was "Sophisticated Weaponry" Involved?*

■ Section 2M5.2 of the Sentencing Guidelines, entitled "Exportation of Arms, Munitions, or Military Equipment or Services Without Required Validated Export Li-

---

**6.** Defendant seizes on language in the *Jamil* court's opinion explaining that a tape recorded conversation involving the defendant was improperly excluded from evidence. The court explained that the evidence was of substantial probative value because it proved that the defendant "knew the shipment he attempted to send overseas was unlicensed and ... that he knew that it required a license." 707 F.2d at 642. In *Jamil*, no question was raised as to whether that

fact was required to prove knowledge of the licensing requirement, and the court was not required to make the distinctions involved here.

**7.** Contrary to defendant's contention, *United States v. Malsom*, 779 F.2d 1228 (7th Cir.1985), does not, despite its discussion of the sufficiency of evidence in that case, actually decide the issue.

cense," now modified, provided at the relevant time for two distinct base offense levels for the covered offenses. If "sophisticated weaponry" was involved, the base offense level was 22. Otherwise it was 14. Following a sentencing hearing, the district court found that the optical receivers and infra-red domes constituted sophisticated weaponry,[8] and fixed the base offense level at 22.

Defendant argues that the government failed to prove that these items were sophisticated weaponry, posing the issue as one of law (subject to plenary review), rather than one of fact (subject to a clearly erroneous standard). Defendant argues by way of comparison to other items on the Munitions Control List, and asserts that, by "contemporary military or scientific standards," neither the optical receivers nor the domes satisfy the Guidelines definition of "sophisticated weaponry." Alternatively, defendant argues that if the base offense level is to be selected not on the basis of whether the components are sophisticated weaponry, but rather on the grounds that they are designed for use as part of such weaponry, the Sidewinder missile is still not sophisticated weaponry by contemporary military or scientific standards.

Additionally, defendant attacks the articulated grounds of the district court's decision by arguing that just because Taiwan was interested in copying the DSU–15, it does not necessarily follow that the item was "sophisticated" for "a simple item may have very precise specifications." Finally, arguing that this specific Guideline is ambiguous, defendant appears to ask us to invoke the rule of lenity. See *United States v. Behrmann,* 1990 WL 304063, 1990 U.S. Dist. LEXIS 5658 (DDC).[9]

The government bears the burden of proving the facts necessary to justify the upward adjustment by a preponderance of the evidence. See *United States v. McDowell,* 888 F.2d 285, 291 (3d Cir.1989). To meet this burden, the government cites various excerpts from the record. First, it points to trial testimony establishing the DSU–15 optical receiver as the key to the most sophisticated version of the Sidewinder missile. Additionally, one of the government's experts, Danis, testified at the sentencing hearing that "without the unit, the missile does not work." Moreover, Danis stated that Taiwan had unsuccessfully sought to obtain the DSU–15 through official channels, but was denied because release of the component would jeopardize national security if the United States lost control of the technology. According to Danis, the version of the Sidewinder equipped with the DSU–15 constitutes state-of-the-art weaponry reserved for the United States' closest allies, and was deployed during the Persian Gulf War as the allies' most sophisticated air-to-air weapon. We have previously described the nature of the domes. See Part II.

We are satisfied that the government has met its burden. Initially, we agree with the district court that it is sufficient if the item in question is a *component* of a sophisticated weapon or weapons system.[10] That is the more sensible reading of the Guideline since otherwise the enhancement would be inapplicable to a defendant who separately shipped component parts of a sophisticated weapons system. See *United States v. Nissen,* 928 F.2d 690, 695 (5th Cir.1991). Given the fact that there was testimony from which the district court could find that the domes and the optical receiver were critical components of the Sidewinder missile, we find that the government met the "weaponry" part of the burden.

---

**8.** The district court stated:

The particular items were on the list. We had testimony that said that the DSU–15, the optical receiver, was a critical component; and I note in particular that a government which was involved in doing research was unable ... to produce this item and was attempting to obtain the item. Based upon that, I do find that sophisticated weaponry was involved.

**9.** The Guideline has in fact been completely revised. See 1991 Guideline Manual, Appendix C, revision # 337, at 159–60. Contrary to the government's contention, the November 1, 1990, version is an entirely different and much stricter rule, not a mere clarification, and it is of no help in construing the applicable Guideline.

**10.** On this point we exercise plenary review.

■ Notwithstanding the defendant's protestations, we are also satisfied that the government sufficiently demonstrated that the optical receivers and the domes as well as the Sidewinder missiles themselves are "sophisticated." There is no precise measure of the degree of necessary sophistication. The district court heard extensive testimony about the potential uses of this weaponry and its level of sophistication in comparison with other modern weapons technology. It also heard the testimony of Shepherd and of Danis, described above, that the optical receivers and domes were an integral part of state-of-the-art weaponry.[11] Giving the term "sophisticated" its plain and ordinary meaning, and applying deferential review, we do not think that the district court was clearly erroneous in its finding. See 18 USC § 3742(e) (1988) (scope of review).

### B. *The Upward Departure*

■ The district court determined the applicable Guideline range in this case to be 51–63 months, based on an adjusted offense level of 24 and criminal history score of I. The court departed upward to level 29 and imposed a term of 87 months in prison (the lowest part of the range at level 29).

The district court explained its departure as follows:

Now, on the issue of departure, I do find, again, by clear and convincing evidence, that this does involve a foreign government. . . . There's just no question about it . . . and I find that huge quantities were contemplated. In considering the quantity and the duration of the offense, I believe that an upward departure is in order, and I find that by clear and convincing evidence; and I will make that upward departure to level 29.

This was not espionage, I agree, but it came very close to it, dangerously close

to it. I'm glad the defendant is concerned about his little boy because I'm concerned about a lot of little boys, too, who are in our armed forces; and I don't think in good conscience I [can] do otherwise than I've done today.[12]

The principles governing departures are by now familiar. If the Commission already included punishment for the same conduct in the Guidelines' base level, then departure based on the same conduct is inappropriate:

A district court must sentence within the applicable guideline range unless the court finds that there exists an aggravating or mitigating circumstance of a kind or to a degree not taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

*United States v. Kikumura,* 918 F.2d 1084, 1098 (3d Cir.1990).

The Guidelines amplify as follows:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

USSCG, Ch 1, Pt A, intro, 4(b) (1988).

The threshold question in any departure case, thus, is whether the facts, as found by the district court, fall within the "heartland." If so, they are of the type that the Commission considered, excluding departure (absent other grounds). We think that in this case they clearly fall within the heartland. The district court departed, at least in part, on the basis of a concern about national security. But the Guideline

---

**11.** The defendant has argued that we should draw an implication about the Sentencing Commission's intent in drawing this Guideline (adverse to the government's position) by comparing the Guideline with the United States Parole Commission's Guideline on the point. We find the analogy unhelpful.

**12.** The district court apparently applied the clear and convincing standard of proof. See *United States v. Kikumura,* 918 F.2d 1084 (3d Cir.1990).

itself explicitly assumes some threat to national security from the subject offenses. The application note to the Guideline, now modified, stated:

> The base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest of the United States.

USSCG § 2M5.2, Note 2.

The court apparently chose level 29, at least in part, because it is the level in part 2M of the Guidelines for unauthorized disclosure of top secret classified information.[13] See USSCG § 2M3 through § 2M6 (1988). But where the Guideline already contemplates the potential harm of a crime, the court cannot depart upward by analogy to another crime involving the same potential harm. See generally *Kikumura*, 918 F.2d at 1098 ("[I]f the circumstances relied upon by the district court to justify the departure were adequately considered by the Sentencing Commission then its decision to depart must be reversed.").

In short, this case falls within the heartland because the Commission, in establishing the Guideline range, considered that the offense was potentially harmful to national security or foreign policy interests. Nothing in the record suggests that defendant's acts were harmful in a way that the Sentencing Commission did not contemplate.[14]

 Further, the district court's analogy to espionage was drawn too bluntly. There was no evidence that the weaponry involved here was top secret or classified. Moreover, the Guideline involved already adjusts the base level for sophisticated weaponry. Thus, even if the Sentencing Commission had not contemplated the potential harm to national security, the analogy that the district court drew to top secret information, which it apparently equated with sophisticated information, was unsupported by the evidence and cannot be affirmed.

 Finally, the court thought that the supposedly large quantity of commerce involved justified its upward departure, because the Guideline involved specifically provided for a guided departure based on "the volume of commerce involved." See USSCG § 2M5.2, Note 2. However, the Guideline section at issue contains its own more rigorous requirement for upward departure. Application Note 2 to Guideline 2M5.2, applicable at the time these offenses were committed, provided that:

> [T]he court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences. *Where such factors are present in an extreme form, a departure from the guidelines may be warranted.* (emphasis added.)

Thus, the amount of commerce involved would have to be extreme to justify an upward departure.

No evidence suggests that the volume and scope of exports involved in this case were extremely large. The government relies on the fact that defendant requested a price for 5,000 DSU–15s and said on the undercover tape that he wanted to purchase "huge quantities" of optical receivers. But the government did not show that defendant placed orders for any such quantities or that he either could or would have. Although 5,000 DSU–15s would be a large quantity of sophisticated weaponry, no evidence demonstrated that that amount or any amount greater than the 11 DSU–15s

---

**13.** Although in the portion of its sentencing remarks immediately prior to announcement of the departure the court did not mention espionage, it did make explicit reference to that offense at the conclusion of its remarks. See p. 164. Under the teaching of *Kikumura*, see 918 F.2d at 1112, analogy is an appropriate basis for departure, and we think it fair to conclude that the district court factored the espionage analogy into its departure decision. This is especially true given that the court departed to level 29, the level under the espionage guidelines for disclosing top secret information. See USSCG § 2M3.3.

**14.** The district court's comment about our young men fighting at the time of the sentence in the Gulf War was understandable, but inappropriate here, and certainly not a basis for departure.

that were actually exported was within the organizational capability of the defendant and his co-conspirators. Nor was the extent of planning and sophistication involved in defendant's scheme sufficient to justify departure. Finally, the conspiracy was not unduly long.

We conclude that the district court departed upwards inappropriately because it increased the sentence based on a factor that the Sentencing Commission had already included in the base offense. Also, there is no basis for a guided departure, see USSCG, Ch 1, Pt A(4)(b), either because the volume of commerce involved was substantial or for any other reason. Therefore, the sentence must be vacated and the case remanded for resentencing. See 18 USC § 3771 (1988).

### C. *The Requested Downward Adjustment for Less Than Average Culpability*

 The district court adjusted the offense level upward two levels under USSCG § 3B1.1(c) because defendant was a manager or supervisor of the involved criminal conduct. The court explained this ruling as follows:

> [C]onsidering all the evidence, particularly the evidence at trial, ... as I sat through listening to those tapes in this courtroom, number one, there was absolutely no question that the Defendant was guilty, that he knew what he was doing was wrong, he even said so in one of the tapes, and that he was in a managerial level. He made the telephone calls. He was persistent in making those calls. He made arrangements. He was the boss when Tommy, who is now a fugitive, was not present. I'm well aware that there were others in the scheme. His dealings were with people in another country; and they, of course, are not on trial her[e] today. Based upon all of that, I would have to say ... that he was in a position to exercise decision-making authority. We heard

him do it on the tapes. Based on the nature and scope of his activity, ... and based upon the degree of his participation in the planning and the organization, I again find by clear and convincing evidence that he does qualify for the two level increase because of his managerial role in this offense.

As the defendant himself concedes, these findings, although disputed, are not clearly erroneous.

Defendant contends, however, that the district court erred in not offsetting these points with a corresponding two-point reduction under USSCG § 3B1.2(b), because defendant also qualified as a "minor participant" in the offense. Defendant submits that on facts like those present here, aggravating and mitigating roles in the offense, as defined by the Guidelines, can coexist, and that where they do, they should be deemed to cancel each other out. The government disagrees and asserts a "logical inconsistency."

Defendant submits that the evidence shows that his brother, Tommy Tsai, was the scheme's leader and that, whenever his brother was present, defendant deferred to his authority. In essence, defendant contends that his role was to carry out instructions that he received by fax from Taiwan, even when he acted alone. While not denying that he was more culpable than Rosen, defendant asserts that he was less culpable than his brother and the officials of the Chung Shan Institute of Science and Technology who sought to acquire United States military technology.

The Guidelines define a "minor participant" as one who is "less culpable than most other participants, but whose role could not be described as minimal." USSCG § 3B1.1, note 3. According to the application note, the "participants" that must be considered in this comparison include all those who were "criminally responsible for the commission of the offense, but ... not ... convicted." Id. at note 1.[15]

15. The Guidelines provide for a four-level reduction for a "minimal participant," but defendant makes no claim to that status.

The district court apparently assumed that because it had (properly) found that there could be an upward adjustment for role in the offense, there could be no downward adjustment for less than average culpability.[16] This assumption is incorrect. Nothing in the Guidelines or in the enabling legislation, the Sentencing Reform Act, 18 USC §§ 3551 to 3585 (1988), compels that conclusion. We, of course, intimate no view as to whether, under the facts, the defendant is entitled to such a downward adjustment, but the district court should consider the matter on remand.

While the judgment of conviction itself will be affirmed, the judgment of sentence will be vacated and the case remanded for further proceedings with respect to sentencing consistent with this opinion.

---

16. Defendant raised the argument at his sentencing hearing that the upward adjustment for his role in the offense should be mitigated by a downward adjustment for less than average culpability but the district court, although not explicitly addressing the argument, sentenced defendant in accord with the government's theory that such a "washout" was logically impossible.