10 F.3d 808
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee/Cross-Appellant,
v.
Ronald J. HOFFMAN, Defendant-Appellant/Cross-Appellee.
 Nos. 92-50299, 92-50354 and 93-50116.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 6, 1993.
Decided Nov. 12, 1993.
 
 1
 Before: HALL and RYMER, Circuit Judges, and FITZGERALD,* Senior District Judge
 
 
 2
 MEMORANDUM**
 
 
 3
 Ronald J. Hoffman was a rocket scientist with expertise in rocket plume technology. He helped develop computer programs to predict the effects on spacecraft of contamination emitted from rocket nozzles. These programs are called CONTAM. Various versions were created: by 1973 CONTAM II had been released to the public; CONTAM III, which was an end-to-end program, was developed for the United States Air Force and was completed in 1981. CONTAM III was later upgraded to CONTAM 3.2 and CONTAM 3.2 SDI (a specialized version for the Strategic Defense Initiative). CONTAM III, 3.2 and 3.2 SDI were on the Munitions List, 22 C.F.R. Sec. 121, and their export was restricted.
 
 
 4
 Although Hoffman worked for Science Applications International Corporation (SAIC) from 1978-1990, he also started his own business, Plume Technology, Inc. (PTI), in 1986. In 1990, the government got wind of his exporting CONTAM III, 3.2 and 3.2 SDI without a license, and began an undercover investigation during which agents posed as representatives of Armscore, the defense industrial segment of the South African military. After agreeing to transfer this technology through Germany to South Africa, Hoffman was arrested and charged with violating the Arms Export Control Act, 22 U.S.C. Sec. 2778(c) ("AECA") and the Comprehensive Anti-Apartheid Act, 22 U.S.C. Secs. 5067(a), 5113(b)(3), 5114 ("CAAA").
 
 
 5
 Hoffman was convicted on all counts following trial to the court. His appeal requires us to decide whether the district court correctly found that the programs he exported were on the Munitions List. Hoffman also appeals the district court's denial of his motion for a new trial based on changes in the regulations which he claims are newly discovered evidence. He urges that the court erred in refusing to depart downward, and the government, in turn, cross appeals the district court's failure to find that the programs Hoffman exported were sophisticated weaponry such that his sentence should have been enhanced under U.S.S.G. Sec. 2M5.2. We affirm the conviction, sentence, and denial of the motion for a new trial.
 
 
 6
 * Hoffman argues that the prosecution violated due process by colluding with the State Department to have the CONTAM III programs declared not exportable, refusing to produce any official version of the CONTAM software charged in the case, losing a computer tape which would have exculpated Hoffman, creating a sham undercover operation to manufacture evidence on intent, and failing to give him notice that his conduct was illegal.
 
 
 7
 The collusion point essentially claims outrageous government conduct. Reviewing the claim de novo, United States v. Smith, 924 F.2d 889, 897 (9th Cir.1991), we conclude it lacks support. Hoffman argues that Clyde Bryant, the State Department Official who testified that exported CONTAM programs were on the Munitions List, simply gave the prosecutors what they believed they needed to convict on the eve of trial and after several private meetings. Bryant was the chief of the Compliance Analysis Division, whose responsibility is to see to it that the AECA Act and the International Traffic and Arms Regulations are complied with. His testimony that discussions with prosecutors were "part of his job" was not contradicted. Therefore, it cannot be said that improper or outrageous conduct occurred.
 
 
 8
 Hoffman also claims that the government created a sham undercover operation to manufacture evidence on intent. However, nothing in the record indicates that the government manufactured the case from "whole cloth." United States v. Green, 962 F.2d 938, 942 (9th Cir.1992). Rather, after a tip by Hoffman's secretary, the government undertook an undercover operation which successfully sought to obtain evidence of his criminal intent.
 
 
 9
 Hoffman also argues that the government violated due process by failing to produce an "official version" of the CONTAM III programs. It is unclear that any such thing existed, but in any event its absence could not have infringed Hoffman's due process rights as the versions Hoffman exported were compared to "working" versions of the restricted programs.
 
 
 10
 Hoffman next argues that due process was violated because the government lost an exculpatory computer tape which was seized by agents during a search of Hoffman's home. Because there is no evidence of bad faith, this argument fails. United States v. Cooper, 983 F.2d 928 (9th Cir.1993) (government's failure to preserve potentially exculpatory evidence violates due process: if government agents act in bad faith and the defendant is prejudiced).
 
 II
 
 11
 Hoffman argues that the law, including whether the programs he exported were on the Munitions List, is too vague to support criminal liability. Because of the law's structure and specific intent requirement, we disagree. Hoffman also makes the related argument that he actually lacked the specific intent to violate the law.
 
 
 12
 * The Arms Export Control Act gives clear notice that any person who "willfully violates any provision of this section ... or any rule or regulation issued under either section" is subject to criminal liability. 22 U.S.C. Sec. 2778(c). Section 2778(a) authorizes the President to create the United States Munitions List, which is a designation of defense articles and services the President may regulate. 22 U.S.C. Sec. 2778(a). Although the designation in this case is categorical, it is clear that Hoffman knew that export of items on the Munitions List, including CONTAM III, 3.2 and 3.2 SDI, without a license, would violate the law.
 
 
 13
 Hoffman complains that it was just before trial that the government produced a certification by the Director of the Office of Defense Trade Controls, United States Department of State, which established that the "CONTAM III computer programs and any upgrades and/or modifications thereto are, and have been since their inception, covered by the U.S. Munitions List, 22 C.F.R. Sec. 121.1 ... and are not in the public domain." There does not, however, appear to be a material dispute that CONTAM III, 3.2 and 3.2 SDI are covered; the dispute, rather, centers on whether the programs Hoffman exported were the covered CONTAM III, 3.2 or 3.2 SDI versions or were instead CONTAM programs that were already in the public domain.
 
 
 14
 There is substantial evidence that Hoffman knew that CONTAM III (and upgrades) were on the Munitions List and intended nevertheless to export them. Courts have often rejected arguments that a law is vague when it requires specific intent because, necessarily, to support a conviction the defendant must have intended to violate the law. See, e.g., Screws v. United States, 325 U.S. 91 (1945). The AECA requires specific intent for a conviction and, as the district court found, evidence that Hoffman knowingly intended to export restricted data was virtually dispositive.
 
 
 15
 For example, there were numerous communications in connection with projects Hoffman worked on which clearly indicated that CONTAM III programs were restricted. The Air Force had written Hoffman indicating that he could use CONTAM III for calculations relating to a French project, but that "no ... computer programs ... may be supplied to" the French group. On another project, SAIC had written to the Office of Munitions Control in the State Department requesting permission to use CONTAM III in a research assignment for an Italian group; the letter acknowledges that SAIC "is aware of the export restrictions related to the CONTAM III computer code [and that] ... CONTAM III code and the technical data pertaining to the code shall not be transmitted." And there was a letter from the State Department to SAIC approving the use of CONTAM III in a German project, but providing that "CONTAM III restricted computer code may not be released." Another letter from State to SAIC approved the use of CONTAM III in an Italian project, but stipulated that "CONTAM III restricted computer programs" could not be disclosed. Finally, the State Department had approved use of CONTAM III, but not transfer of the software, in connection with a Japanese project.
 
 
 16
 In addition, during the undercover operation and before agreeing to the prohibited export of items to South Africa through Germany, Hoffman asked the agent point blank whether he was a federal agent, and the agent said no. Hoffman had also told a friend that he didn't think the programs should be "kept in the closet" but the government thought so, and that, therefore, he had two options: apply for a license legally and say the transaction is with South Africa, or just do it through Germany. He did it through Germany.
 
 
 17
 From this evidence, the district court properly inferred that Hoffman knew that CONTAM III code, programs, and software were on the Munitions List. This case is, therefore, unlike United States v. Mallas, 762 F.2d 361 (4th Cir.1974) and United States v. Dahlstrom, 713 F.2d 1423 (9th Cir.1983), cert. denied, 466 U.S. 980 (1984), upon which Hoffman relies. In those cases, the law under which the defendants were convicted was unsettled. Here, it was clear to Hoffman that CONTAM III and its upgrades were on the Munitions List, items on the Munitions List are subject to regulation, violations of the regulations under the Arms Export Control Act can create criminal liability, and that export of CONTAM III and its upgrades was restricted. The evidence shows that Hoffman intended to export restricted items. Thus, the laws here are not so vague as to violate due process.[1] See United States v. Edler Indus., Inc., 579 F.2d 516, 521 (9th Cir.1978) (scienter requirement shelters Espionage Act, ch. 30, Secs. 1, 2, 40 Stat. 217 (1917) (current version at 18 U.S.C. Sec. 793) from impermissible vagueness).
 
 
 18
 Finally, Hoffman argues that the undercover agents violated due process by creating "grey areas" and failing to give him notice that his conduct was unlawful. Hoffman points to no authority which holds that due process requires undercover agents to give suspects notice of the illegality of their conduct.
 
 B
 
 19
 Viewing the evidence in the light most favorable to the government, Jackson v. Virginia, 443 U.S. 307, 319 (1979), there was sufficient evidence of Hoffman's specific intent to violate the law. The undercover tapes indicate that Hoffman crafted an entrapment defense while making the transaction.[2] When coupled with Hoffman's extensive background in the area of exporting technical data, and the correspondence between the Air Force and SAIC to which he was privy specifying that the CONTAM III programs, code, and systems were export restricted, there was ample evidence to support the finding on intent. See, e.g., United States v. Malsom, 779 F.2d 1228, 1234 (7th Cir.1985) (where evidence discloses that defendant was warned on numerous occasions that export licenses were required, evidence was sufficient for jury to conclude that defendant had specific intent).
 
 III
 
 20
 Hoffman argues that the court applied an incorrect legal definition of "public domain," and erred in finding that the evidence showed that CONTAM III programs were in the public domain.
 
 
 21
 * If the CONTAM III programs were in the public domain, then the AECA does not prohibit their exportation. The AECA prohibits the willful violation of any provision, "or any rule or regulation issued under" the Arms Export Control Act. 22 U.S.C. Sec. 2778(c). Subchapter M of 22 C.F.R. contains the regulations on Arms Export Control, known as "ITAR," or International Traffic in Arms Regulations. The regulation governing technical data, 22 C.F.R. Sec. 125.1, provides that "[i]nformation which is in the 'public domain' (see Sec. 120.18) is not subject to the controls of this subchapter." 22 C.F.R. Sec. 125.1(a). Hence, as stated in United States v. Posey, 864 F.2d 1487 (9th Cir.1989), "the substantive offense of violating the AECA requires that a defendant actually export Munitions List items not in the public domain." Id. at 1492 (emphasis added, see also id. (unlike the AECA, the CAAA applies to exports that are in the public domain). The government agrees that in this circuit, it bears the burden of proof on this issue.
 
 
 22
 22 C.F.R. Sec. 120.18 defines public domain as
 
 
 23
 information which is published and which is generally accessible or available to the public:
 
 
 24
 (a) Through sales at newsstands and bookstores;
 
 
 25
 (b) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;
 
 
 26
 (c) Through second class mailing privileges granted by the U.S. Government; or,
 
 
 27
 (d) at libraries open to the public.
 
 
 28
 Hoffman contends that the district court construed this definition too narrowly by insisting that the defendant's showing conform strictly with the regulation.
 
 
 29
 Hoffman suggests that (a) through (d) only modify "available to the public," not "generally accessible." Under Hoffman's reading, an item that is "generally accessible" may be in the public domain even though it does not fall into categories (a)-(d). Hoffman then argues that something may be "generally accessible" if it has always been in the public domain, or if it was distributed without restrictions at Air Force workshops. Hoffman points to a proposed amendment to the regulations, reported in the Federal Register, as support for this argument.[3] 57 Fed.Reg. 19666 (1992). The Federal Register describes this amendment as "add[ing] methods by which technical data may be placed in the public domain." id., at 19667, and also notes that the "definition of public domain has been expanded and clarified." Id. at 19666.
 
 
 30
 The plain meaning of the regulation indicates that the information must fall within one of the four categories to be within the "public domain." If (a)-(d) only modify "available to the public," the regulation should have separated "generally accessible" and "available to the public" with a comma. In addition, Hoffman's reading leaves the phrase "generally accessible" dangling. Moreover, 22 C.F.R. Sec. 125.4(13) exempts technical data "approved for public release" by the United States Government through, among other things, conference papers, publications, and speeches. If Hoffman's reading of Sec. 125.1 were correct, and "generally accessible" were broad enough to include information disseminated at conferences, then the Sec. 125.4(13) exemption would be unnecessary. Courts generally avoid statutory interpretations which render language inconsistent, meaningless, or superfluous. See Boise Cascade Corp. v. EPA, 942 F.2d 1427, 1432 (9th Cir.1991). Finally, Hoffman's reliance on the later amendments is in any event misplaced, as there was substantial evidence that unlimited distribution did not occur.
 
 B
 
 31
 Hoffman next challenges the sufficiency of the evidence concerning the public domain status of the exported CONTAM programs. We see no error.
 
 
 32
 Clyde Bryant of the State Department testified that the State Department determined, after consulting with the Department of Defense, that the CONTAM III programs (and later versions) were not in the public domain. Victoria Cox, an Air Force physicist and government manager for the CONTAM programs, also testified that the CONTAM III programs had capabilities that were not available elsewhere and were not in the public domain. Air Force Lieutenant Ronald Furstenau testified that CONTAM III was not publicly available, and Alan Kawasaki, one of Hoffman's former colleagues, testified that results obtained from CONTAM III programs could not be replicated from information contained in certain published articles.
 
 
 33
 Hoffman argues that the programs were distributed without restriction at certain Air Force seminars, and therefore were within the public domain. There was evidence to the contrary, however; Major Furstenau testified that strict guidelines were followed on the distribution of the CONTAM III programs, and that they were not generally available to anyone who attended a seminar.
 
 
 34
 Certainly there was evidence, as Hoffman notes, that individual programs such as ODE, CHEMKIN/KINCON, TBL, TPPLUME, and TCC, which he exported, were in the public domain, and that improvements which resulted in the later versions CONTAM 3.2 and 3.2 SDI were not significant. However, there was ample evidence that when the programs are linked together, they become part of a code with unique capabilities that is not in the public domain. Hoffman's complaints about Bryant's and Cox's credibility simply represents a conflict which the district court resolved in the government's favor. We cannot say the evidence was insufficient or that the district court erred in its conclusions.
 
 IV
 
 35
 Hoffman contends that the court erred in refusing to review the State Department's Munitions List determination. Because there is no dispute that CONTAM III, 3.2 and 3.2 SDI are covered, Hoffman's argument essentially is that the district court collapsed the inquiry about whether the items he in fact exported were on the list, with the issue of whether the CONTAM III programs are themselves on the list--which Hoffman agrees is an unreviewable political question.[4]
 
 
 36
 The Munitions List regulations do not specifically list the CONTAM III programs. Rather, the regulations are categorical and the pertinent category is "technical data."
 
 
 37
 Whether an item is on the Munitions List is decided by the Department of State with the concurrence of the Department of Defense. 22 C.F.R. Sec. 120.2. A designation is "based primarily on whether an article ... is deemed to be inherently military in character." Id. Sec. 120.3. Technical data under the regulations is defined as
 
 
 38
 (a) Classified information relating to defense articles and defense services;
 
 
 39
 (b) Information covered by an invention secrecy order;
 
 
 40
 (c) Information, in any form, which is directly related to the design, engineering, development, production, processing, manufacture, use, operation, overhaul, repair, maintenance, modification, or reconstruction of defense articles.... includ[ing] information which advances the state of the art of articles on the U.S. Munitions List.
 
 
 41
 Id. Sec. 120.21. Hoffman does not disagree that whether an item is "inherently military in character" or relates to the design, engineering, development, production, etc., of an inherently military article is a question of policy which courts may not review.
 
 
 42
 However, he does argue that when the exported item is information, the court can and must review whether the information constitutes "technical data." See United States v. Van Hee, 531 F.2d 352, 356 (6th Cir.1976) (court found close connection between the data exported and the article designated in the Munitions List). Because this case involves information, Hoffman submits that it is controlled by Edler. Assuming Edler requires that the data exported be connected to some item on the Munitions List and that the relationship be clear, as Hoffman urges, we nevertheless do not believe the district court erred.
 
 
 43
 In Edler, the court was faced with a First Amendment challenge to the prohibition of the export of technical data by the AECA. Rather than reach the First Amendment issue, we narrowly construed the regulations and found that they only prohibited the exportation of technical data "significantly and directly related to specific articles on the Munitions List." Id. at 521. Given this holding, the court reversed a conviction because the trial court did not allow the defendants to produce evidence of nonmilitary use, which would have been relevant to scienter. Id. at 522. By contrast, the district court in this case permitted Hoffman to adduce all the evidence he wished about whether the programs he exported were the COMTAM III programs covered by the List.
 
 
 44
 As the court saw it, "the only issue was whether or not those exports [charged in counts one to seven] were of CONTAM versions II or of the III series." Based on the testimony of Kawasaki, Rao and Cox, the court found beyond a reasonable doubt that each of the exported items were CONTAM III, 3.2 or 3.2 SDI programs. The court separately found that the CONTAM III, 3.2 and 3.2 SDI programs are technical data covered by the Munitions List. As to that, the court correctly declined to look behind the designation. The district court therefore made the appropriate factual inquiry.[5]
 
 
 45
 In sum, the district court correctly concluded that the only allowable inquiry having to do with the designation is whether an item has actually been designated in the Munitions List by the Department of State. The court did not clearly err in finding that the items Hoffman exported were the CONTAM III, 3.2 or 3.2 SDI programs covered by the List.
 
 
 46
 This does not allow a conviction by "incantation." The specific intent requirement insures that no one will be convicted by surprise, and the public domain exclusion ensures that the government cannot place anything it wants on the Munitions List. See Edler, 579 F.2d at 521.
 
 V
 
 47
 Both Hoffman and the government appeal the district court's sentencing determinations.
 
 
 48
 * Hoffman first argues that the court erred in refusing to depart downward because his case was outside of the "heartland" of the core offenses under the Guidelines. A district court's discretionary refusal to depart downward is not subject to review. United States v. Garcia-Garcia, 927 F.2d 489, 491 (9th Cir.1991) (per curiam). The sentencing judge here stated in response to Hoffman's request for a downward departure that
 
 
 49
 I think the fact that the defendant has this very special skill, he's highly thought of even now by Goddard Space Center and others. It's very appealing and very tempting, but in the end I think I have to treat him like anybody else.
 
 
 50
 I don't see that as affording a downward departure. I am not going to depart.
 
 
 51
 In context, this amounts to a discretionary decision to depart in that the court declined to treat Hoffman differently just because he was a rocket scientist. Nothing in the record indicates that the court thought it was barred from departing. Thus, its refusal to depart is not subject to review.
 
 
 52
 Next Hoffman argues that the court erred in failing to group counts 5, 6, 7, 8, and 10. The court adopted the determination of the Presentence Report, which grouped counts 7, 8, and 10, and treated counts 5 and 6 separately. Count 5 charged Hoffman with violating the AECA by exporting programs to Japan on May 31, 1988; count 6 charged him with violating the AECA by exporting programs to Japan on October 12, 1989; count 7 charged that he violated the AECA by exporting programs to South Africa on June 14, 1990; count 8 charged violations of the CAAA through the same June 14, 1990 export in count 7; and count 10 charged Hoffman with being in the business of exporting defense articles without registering.
 
 
 53
 Hoffman argues that the court should have grouped all of these counts because they involve the same harm to the United States--disclosure of technical data related to defense articles. The relevant provisions on grouping allow counts to be grouped when they involve the same victim or the same act or transaction or when they involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting a part of a common scheme or plan. U.S.S.G. Sec. 3D1.2. The commentary explains that when a person is charged with assaulting the same federal officer on two separate days, the counts are not to be grouped together. Id. comment. n. 2. Similarly, robbery of the same victim on different days involves two separate crimes. Id. comment. n. 3. Under the commentary, only when the crimes involve "one composite harm" to the same victim are they to be grouped together. Id. comment. n. 4.
 
 
 54
 Hoffman's crimes did not involve one composite harm. Count 5 was a separate shipment to a separate company than the shipment charged in count 6. Counts 7 and 8 involved the same shipment to South Africa, so it was proper to group those two together. However, it would have been error to group counts 7 and 8 with either count 5 or 6 since the counts involved different shipments to different companies, and therefore there was not a "composite harm" resulting from a single course of conduct. That the victim was always the United States makes no difference. If assaulting the same officer on two separate occasions should not be grouped, then disclosing military secrets on two separate occasions to two separate companies in different countries should not be grouped.
 
 B
 
 55
 The government appeals the district court's calculation of Hoffman's offense level under the 1987 version of U.S.S.G. Sec. 2M5.2. That section provides a base level of 22 if "sophisticated weaponry was involved." The district court found that the programs were not "sophisticated weaponry," but rather were "a research and design tool, not a weapon." The government disputes this finding.
 
 
 56
 In United States v. Helmy, 951 F.2d 988 (9th Cir.), cert. denied, 112 S.Ct. 2287 (1992), we held that "whether a particular item falls within the category of sophisticated weaponry is strictly ... factual" and therefore is reviewed for clear error. Id. at 994. In Helmy, as here, the dispute involved "two permissible views of the evidence," and as in Helmy, we uphold the district court's determination because the choice of one permissible view of the evidence over another cannot be clearly erroneous. Id. at 996; see also United States v. Tsai, 954 F.2d 155, 163-64 (3d Cir.) (whether an item is sophisticated weaponry is reviewed for clear error), cert. denied, 113 S.Ct. 93 (1992).
 
 
 57
 The district court's finding that the CONTAM III programs were not "sophisticated weaponry," but rather design tools, was supported by several declarations from engineers and scientists. That the government presented another permissible view of the evidence does not render the district court's decision clearly erroneous.
 
 
 58
 The government argues that the district court ran afoul of Helmy's holding that component parts of sophisticated weaponry are "sophisticated weaponry." Helmy does hold that weaponry components are within the Guidelines definition of sophisticated weaponry. Id. at 993; see also Tsai, 954 F.2d at 163. Nevertheless, the court held that the CONTAM III programs were neither components of nor themselves sophisticated weaponry. This finding is not clearly erroneous because at most, the government can only show that there were conflicting views of the evidence.
 
 VI
 
 59
 In separate sets of briefs, Hoffman argues that the district court erred in denying his requests for a new trial based on newly discovered evidence. See Fed.R.Crim.P. 33 (allowing motion for new trial based on newly discovered evidence). The newly discovered evidence consists of proposed amendments to the regulations, which, according to Hoffman, indicate that CONTAM III programs should not be on the Munitions List. The denial of a motion for a new trial based on newly discovered evidence is reviewed for an abuse of discretion. United States v. George, 960 F.2d 97, 101 (9th Cir.1992).[6]
 
 
 60
 To succeed in bringing a motion for a new trial based on newly discovered evidence, Hoffman must show that the evidence is discovered after trial, that the motion alleges facts from which the court could conclude that he was diligent despite not finding the evidence, that the evidence was not cumulative or impeaching, that the evidence was material, and that the evidence would probably produce an acquittal. United States v. Krasny, 607 F.2d 840, 843-44 (9th Cir.1979), cert. denied, 445 U.S. 942 (1980).
 
 
 61
 Hoffman's newly discovered evidence is immaterial. The pertinent issue at trial was whether the CONTAM programs Hoffman exported were the CONTAM III programs on the Munitions List at the time Hoffman exported them. The new regulations at most indicate that the CONTAM III programs should no longer be on the List. That the State Department has concluded that certain items no longer pose a defense risk today has no bearing on whether those items posed a defense risk at the time Hoffman exported the programs, that is, during the period 1986-90. Cf. United States v. Gallegos, 295 F.2d 879, 881 (9th Cir.1961) (per curiam) (denying motion for new trial based on new administrative agency interpretation), cert. denied, 368 U.S. 988 (1962). Hoffman has failed to point to any indication that the regulations were intended to apply retroactively.
 
 
 62
 Moreover, Hoffman has not in fact produced new "evidence." What he has come forward with is a new proposed regulation. In United States v. Shelton, 459 F.2d 1005 (9th Cir.1972) (per curiam), we held that new law is not new evidence within Rule 33. Id. at 1007; see also Gallegos, 295 F.2d at 881 (refusing to concede that agency interpretation is new "evidence."). Finally, Judge Tashima indicated that he was not convinced that the Munitions List determination made at trial was incorrect even in light of the new regulations. Hence, we cannot say that an acquittal "probably" would have resulted.
 
 
 63
 AFFIRMED.
 
 
 
 *
 Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Other circuits analyze notice arguments similarly. In United States v. Swarovski, 592 F.2d 131 (2d Cir.1979), the defendant was convicted of exporting a camera on the Munitions List, and argued on appeal that he was given insufficient notice that the camera was export restricted. As the Second Circuit said, notice arguments must be viewed "in the light of the facts before the court." Id. at 133. The arms export business concerns "a regulation of limited scope aimed at a small and relatively sophisticated group of persons. [Regulations] put exporters squarely on notice that they need [ ] a license in order to export [Munitions List articles] ... and therefore satisf[y] constitutional requirements." Id. see also United States v. Markovic, 911 F.2d 613, 616 (11th Cir.1990) (rejecting vagueness argument)
 
 
 [2]
 Hoffman said, for example, "let's have conversations with each other where we all pretend as though someone is standing right over there, that we don't want to hear." He described the type of documentation he would like to ensure that the export was not going to be used militarily, and asked if the negotiator was an undercover agent
 
 
 [3]
 The amendment adds the following to the public domain definition:
 (5) Through patents available at any patent office;
 (6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;
 (7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also Sec. 125.4(b)(13)).
 
 
 [57]
 Fed.Reg. at 19671
 
 
 [4]
 27 U.S.C. Sec. 2778(h) precludes judicial review of the designations on the Munitions List. See also United States v. Mandel, 914 F.2d 1215 (9th Cir.1990); United States v Martinez, 904 F.2d 601 (11th Cir.1990); Spawr Optical Research, Inc. v. Baldridge, 649 F.Supp. 1366 (D.D.C.1986)
 
 
 [5]
 Other circuits have approached the issue similarly. In United States v. Tsai, 954 F.2d 155 (3d Cir.), cert. denied, 113 S.Ct. 93 (1992), for example, the trial court allowed testimony from the State Department and certain expert witnesses about whether an item was on the Munitions List. On appeal, the defendant challenged the sufficiency of the evidence showing that the item was on the List. The court held that there was sufficient evidence of the defendant's need for an export license. Id. at 160. See also United States v. Durrani, 835 F.2d 410, 426 (2d Cir.1987) (upholds district court admission of a State Department official's testimony regarding the Munitions List over a hearsay objection, stating that "[t]he statute empowers the State Department to determine whether [an item] appears on the Munitions List.")
 
 
 [6]
 Hoffman argues that this court's review should be de novo since ultimately the motion is based on new evidence which bears on a legal question--whether CONTAM III is on the Munitions List. We do not need to resolve this point, as our view is the same under either standard