PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-4356

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRIAN KEITH BISHOP,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:12-cr-00395-CMH-1)

Argued: December 11, 2013          Decided: January 28, 2014

Before WILKINSON, DIAZ, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Diaz and Judge Thacker joined.

**ARGUED**: Joseph Michael Hannon, Jr., HANNON LAW GROUP, LLP, Washington, D.C., for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF**: William Coffield, COFFIELD LAW GROUP, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, Ronald L. Walutes, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

WILKINSON, Circuit Judge:

The Arms Export Control Act (AECA), 22 U.S.C. § 2778, regulates the export of "defense articles" such as ammunition, and subjects to criminal liability anyone who "willfully" violates its requirements. Brian Keith Bishop was convicted under the law for attempting to export small-arms ammunition to Jordan without a license. He appeals his conviction on two grounds: first, that he did not willfully violate the AECA because he did not know that it applied to the ammunition he attempted to export, and second, that there was insufficient evidence that he even knew that exporting the ammunition was generally illegal rather than merely a violation of administrative policy. We reject Bishop's contentions and affirm his conviction.

I.

A.

In 2011, Bishop worked as a financial-management Foreign Service Officer (FSO) at the U.S. embassy in Amman, Jordan. Pursuant to the State Department's policy of shipping employees' personal effects overseas at government expense, Bishop sought in the summer of 2011 to ship certain personal possessions from his parents' home in Alabama to Jordan via a government contract carrier, Paxton Van Lines (Paxton). Bishop, who describes

2

himself as an "avid hunter and sportsman," Appellant's Br. at 2, included nearly 10,000 rounds of small-arms ammunition in his shipment: 9mm, 7.62X39mm (for use in AK-47 assault rifles), and .45-caliber rounds, as well as 12-gauge shotgun shells. Bishop had purchased the ammunition from Cabela's Sporting Goods (Cabela's), and, pursuant to federal law, the Cabela's boxes containing the ammunition were labeled "ORM-D" and "cartridges, small arms."

The day before the movers arrived, Paxton's subcontractor dispatched one of its employees, Brian Davis, to survey the shipment. Davis testified that Bishop informed him that Bishop was moving "weights" and neglected to mention ammunition. When workers loaded Bishop's shipment the next day, some of the ammunition remained in the Cabela's boxes, while the rest had been transferred to unlatched hard-shell pelican cases. Bishop's father testified that, when the shippers asked Bishop what was inside the cases, Bishop replied "bullets." The inventory of shipped items signed by Bishop, however, did not reference the 366 pounds of ammunition included in his household effects, instead listing them as weights. Bishop also signed a statement certifying that his belongings did not include "any unauthorized explosives, destructive devices or hazardous materials." An internal email between Paxton employees suggested that Bishop "did not like [the movers] questioning him

3

on what he was shipping," and that he had organized his possessions so as to discourage the movers from inspecting them.

The movers transferred Bishop's items to a Paxton warehouse in Springfield, Virginia. At the warehouse, Paxton employees determined that certain items required repackaging, and Bishop's ammunition was discovered during the repacking process. According to one employee, the ammunition was removed from boxes labeled "weights" on the inventory, but that one of the boxes did in fact contain a single small weight. Two days later, Paxton alerted the State Department, and special agents with the State Department's Diplomatic Security Service (DSS) ultimately took custody of the ammunition. The Paxton employee in charge of Bishop's shipment testified that, when she called Bishop and told him that ammunition had been discovered, he asked her whether the State Department knew how much ammunition he had attempted to ship. She also testified that Bishop told her that the ammunition was a gift for a government official for which he would be repaid, and that she should not speak with any of the Jordanian nationals at the embassy about the shipment.

A little over a year later, DSS agents interviewed Bishop and informed him that an arrest warrant had been issued for violations stemming from his attempted shipment of the ammunition. Bishop waived his <u>Miranda</u> rights and, according to the agent who interviewed him, admitted to the attempted

4

shipment. The agent testified that Bishop claimed the ammunition had been intended for his recreational use at firing ranges and for shooting with "veteran tribesmen in the desert," and that he attempted to ship the ammunition because it would have been prohibitively expensive to purchase it in Jordan. The agent also testified that Bishop admitted that he had known that the embassy prohibited FSOs from having firearms, that he had a shotgun in his residence without his wife's knowledge, and that he had lied the previous year when he told a DSS agent that he did not have any firearms in his residence.

## B.

In September 2012, a federal grand jury returned a two-count indictment against Bishop relating to his attempted transportation of the ammunition. As amended, Count I of the indictment charged Bishop with a violation of the AECA and its implementing regulations. Specifically, the indictment alleged that Bishop "knowingly and willfully attempt[ed] to export from the United States to Jordan, without having first obtained from the Department of State a license for such export, or written authorization for such export, defense articles, to-wit: approximately 7,496 rounds of 9mm and 7.62 X 39mm ammunition, which are designated as defense articles on the United States Munitions List, Category III." Count II charged Bishop with

5

delivering ammunition to a common and contract carrier, Paxton, without notice in violation of 18 U.S.C. § 922(e). Count II covered not only the ammunition identified in Count I, but also the nearly 2,000 rounds of .45-caliber and 12-gauge shotgun ammunition included in the shipment.

Bishop waived his right to a jury trial. At the bench trial, the government argued that Bishop willfully shipped the prohibited ammunition in violation of the AECA. The government relied in part on an email sent by Paxton to Bishop's wife (and then forwarded to Bishop) which stated that ammunition was a "prohibited item in th[e] shipment." Among the witnesses the government called was a DSS agent who testified that, prior to traveling to Alabama to arrange his effects, Bishop had asked the agent if he was permitted to use firearms while in Jordan, and was told that he was "not allowed to have firearms in accordance with mission policy."

The government also called Mette Beecroft, a State Department official responsible for educating State Department employees on the rules and regulations governing travel. Beecroft testified that the State Department maintains a Foreign Affairs Manual (FAM), a collection of regulations for FSOs, including those governing travel and transportation. The FAM prohibits the shipment of ammunition in household effects in three separate sections. One section identifies 27 C.F.R. § 478

6

as authority for the FAM's ammunition provisions. This regulation, in turn, states that ammunition exports are subject to the AECA. Another FAM section puts employees on notice that shipping ammunition may require special accommodations. It notes, for instance, that household effects may not include ammunition and further states that federal law may "prohibit commercial shipment of certain articles in" this section. 14 U.S. Dep't of State, Foreign Affairs Manual § 611.5. The third section informs employees that "[a]mmunition, a hazardous cargo, requires special handling and labeling," and that it is the responsibility of each FSO to check with their post "to determine the restrictions and limitations, if any, that are placed upon the shipment of personally owned firearms or ammunition into the country of assignment." Id. § 611.6-2.

According to Beecroft, all State Department employees are required to participate in an orientation program that introduces them to the rules contained in the FAM, including those pertaining to the transport of ammunition. Beecroft testified that, in every training class, she stresses that shipping ammunition is not permitted. Beecroft also described a manual entitled "It's Your Move," which is mentioned during training and is available to all State Department employees both in print and online. The manual repeatedly prohibits the shipment of ammunition as a household effect, and notes that the

7

penalties for improper shipment of hazardous items include imprisonment. On cross-examination, Beecroft admitted, "I can't tell you what the State Department's reasoning is" for prohibiting the shipment of ammunition.

In response, Bishop called Luis Roque, former branch chief for the State Department's transportation-management bureau and the individual who initially dealt with the ammunition when Paxton contacted the State Department. Roque testified that, despite overseeing the shipment of all household effects for the State Department, he was "desperate" for advice on how to proceed upon being alerted of the discovery of the ammunition. He initially instructed Paxton to dispose of the ammunition with the assistance of the fire marshal. He subsequently contacted diplomatic security experts, who countermanded his prior instruction.

Bishop also called the Regional Security Officer at the embassy in Jordan, who explained that, under the Mission Firearms Policy, which governs FSOs stationed there, Bishop was permitted to possess ammunition in his residence. He also stated that the disciplinary action prescribed by the policy for any violation is purely administrative.

Another one of Bishop's witnesses testified to Bishop's general law-abidingness, emphasizing his diligence and skill at understanding and following complex regulations. The witness,

8

an attorney, recounted an incident in which Bishop had conducted independent research on a legal issue confronting an embassy and reached a conclusion nearly identical to the guidance ultimately provided by State Department headquarters.

At the conclusion of the one-day trial, the district court convicted Bishop of Count I and acquitted him on Count II. With respect to intent under Count I, the court found that the "evidence is clear that [Bishop] knew what he was doing was unlawful and simply went ahead and did it." Regarding Count II, the district court found "that the markings on [the Cabela's] boxes clearly provided notification to [Paxton] that ammunition was being transported."

Bishop subsequently filed a motion to vacate the judgment and for a new trial, alleging that the government had introduced insufficient evidence to demonstrate that Bishop had the requisite intent to violate the law. The district court denied this motion and sentenced Bishop to two-years probation and six-months home confinement subject to work release, in addition to a $25,000 fine. Bishop now appeals his conviction.

II.

Count I of the indictment charged Bishop with attempting to export 9mm and 7.62X39mm ammunition without a license in willful violation of the Arms Export Control Act. The AECA regulates

9

the export of arms, ammunition, and other military and defense technology. It delegates to the President the tasks of creating the United States Munitions List (USML), which designates certain items as "defense articles and defense services," and of promulgating "regulations for the import and export of such articles and services." 22 U.S.C. § 2778(a)(1). The President has delegated this authority to the State Department, see Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 24, 1977), which publicly maintains the USML, see 22 C.F.R. § 121.1. With limited exception, anyone seeking to export items on the USML must first apply for and receive an export license from the State Department. See 22 U.S.C. § 2778(b)(2); 22 C.F.R. § 123.1(a). A defendant who "willfully violates any provision" of the AECA may be punished with a fine of up to a million dollars, a prison term of up to 20 years, or both. 22 U.S.C. § 2778(c).

Bishop raises two challenges to his conviction. First, he argues that, for his conduct to have been willful, he needed to have known not only that exporting the 9mm and 7.62X39mm ammunition was generally unlawful, but that the ammunition was specifically covered by the AECA. Second, Bishop argues in the alternative that there was insufficient evidence to establish beyond a reasonable doubt that he knew his conduct was illegal,

10

rather than merely prohibited by State Department policy.  We address each argument in turn.

A.

Bishop and the government disagree over what constitutes a "willful" violation of the AECA.  Bishop contends that the government must show not only that he knew that his conduct was illegal, but also that he knew why: because 9mm and 7.62X39mm ammunition were listed on the USML.  The government, by contrast, argues that it was enough that Bishop knew exporting the ammunition was illegal as a general matter.  On this point, we agree with the government.

Bishop frames the issue as whether a conviction under the AECA requires specific intent.  See Appellant's Br. at 17.  Courts regularly use the language of specific versus general intent in discussing the AECA's willfulness requirement.  See, e.g., United States v. Chi Mak, 683 F.3d 1126, 1138 (9th Cir. 2012).  Unfortunately, the terms are often left ill-defined and used inconsistently, and as the Supreme Court has observed, the "venerable distinction" between general and specific intent "has been the source of a good deal of confusion."  United States v. Bailey, 444 U.S. 394, 403 (1980); see also 1 Wayne R. LaFave, Substantive Criminal Law § 5.2 (2d ed. 2013) ("The meaning of the word 'intent' in the criminal law has always been rather

11

obscure . . . ."). Other courts have characterized the willfulness provision as imposing some sort of scienter requirement. See United States v. Wu, 711 F.3d 1, 15 (1st Cir. 2013); United States v. Lee, 183 F.3d 1029, 1032 (9th Cir. 1999). Although courts often use the language of general and specific intent, scienter, and the related concept of mens rea interchangeably, see Morissette v. United States, 342 U.S. 246, 252 (1952), none of these terms by itself adequately defines willfulness under the AECA.

Rather than struggle with such confusing terminology, we may simply ask where, on the spectrum of culpability, the AECA's willfulness requirement falls. Both Bishop and the government agree that knowledge of an export's illegality is necessary to satisfy the AECA's willfulness requirement; they disagree over how precise that knowledge must be. This question is ultimately one of statutory interpretation, since "determining the mental state required for commission of a federal crime requires . . . inference of the intent of Congress." Staples v. United States, 511 U.S. 600, 605 (1994) (internal quotation marks omitted).

Our interpretation of the AECA is guided by the Supreme Court's decision in Bryan v. United States, 524 U.S. 184 (1998). The Bryan Court interpreted the Firearm Owners' Protection Act (FOPA), Pub. L. 99-308, 100 Stat. 449 (1986) (codified at 18 U.S.C. §§ 921-929), which established a willfulness requirement

12

for certain violations of prohibitions against dealing in firearms without a license under 18 U.S.C. § 922. See 18 U.S.C. § 924(a)(1)(D). Bryan held that, "to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." Bryan, 524 U.S. at 191-92 (internal quotation marks omitted). It rejected the defendant's argument that the government also had to prove that he knew of the federal licensing requirement, holding that, to establish willfulness, "knowledge that the conduct is unlawful is all that is required." Id. at 196.

In interpreting FOPA, Bryan distinguished statutes where the Court had read "willfulness" as requiring knowledge of the specific criminal prohibition at issue. The Court observed that these cases -- Cheek v. United States, 498 U.S. 192 (1991), and Ratzlaf v. United States, 510 U.S. 135 (1994) -- addressed "highly technical statutes" involving taxes and currency transactions that "presented the danger of ensnaring individuals engaged in apparently innocent conduct." Bryan, 524 U.S. at 194. By contrast, the statutory scheme amended by FOPA to "protect law-abiding citizens with respect to the acquisition, possession, or use of firearms for lawful purposes," id. at 187-88, did not present comparable risks of criminalizing otherwise-innocent behavior. Furthermore, this danger was plainly absent on the facts of the case because, as here, the factfinder "found

13

that [the defendant] knew that his conduct was unlawful."   Id. at 195.

Bryan is highly relevant to our task here.   As with FOPA, the AECA's language and structure make clear that Congress struck a balance between punishing those who intentionally violate the law and ensnaring individuals who make honest mistakes.    As this court has previously emphasized, the willfulness requirement ensures that "the government must prove that a defendant intended to violate the law to obtain a conviction, thereby eliminating any genuine risk of holding a person 'criminally responsible for conduct which he could not reasonably understand to be proscribed.'"   United States v. Hsu, 364 F.3d 192, 197 (4th Cir. 2004) (quoting United States v. Sun, 278 F.3d 302, 309 (4th Cir. 2002)).

At the same time, the AECA's legislative history, while "sparse," United States v. Durrani, 835 F.2d 410, 420 (2d Cir. 1987), makes clear that Congress was especially concerned that arms exports not become an "automatic, unregulated process," H.R. Rep. No. 94-1144, at 12 (1976), reprinted in 1976 U.S.C.C.A.N. 1378, 1388.  To read the willfulness requirement as narrowly as Bishop proposes would be a step toward such an unregulated system and undermine congressional intent.  The AECA does not include such highly technical requirements as might inadvertently criminalize good-faith attempts at compliance.

14

Unlike the complicated tax and arcane currency prohibitions discussed in Cheek and Ratzlaf, the export of 9mm and AK-47 ammunition to Jordan would quickly strike someone of ordinary intelligence as potentially unlawful. Bishop's narrow reading would thus undermine Congress's purpose in passing the AECA and deprive it of its rightful authority to define the elements of federal offenses. See Liparota v. United States, 471 U.S. 419, 424 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute."). For it would be unwarranted for courts to draw from the word "willful" a desire on the part of Congress to require not simply general knowledge of an export's illegality, but specific knowledge of the particulars of a certain list.

Bishop argues that the rule of lenity requires us to view the AECA's willfulness requirement in the light most favorable to him. See Appellant's Br. at 22. But "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute." Barber v. Thomas, 130 S. Ct. 2499, 2508 (2010) (internal quotation marks omitted). That there is no such "grievous ambiguity" in this case is underscored by the fact that Bishop's construction would move the AECA, even further than the willfulness requirement already does, from "the

15

fundamental canon of criminal law that ignorance of the law is no excuse." United States v. George, 386 F.3d 383, 392 (2d Cir. 2004) (Sotomayor, J.). Exceptions to such a venerable rule should be construed narrowly in the absence of clear congressional intent to the contrary. We discern nothing in the language or purpose of the statute to suggest that Congress wished to jettison altogether the bedrock presumption that each of us knows the standards applicable to our personal conduct.

Given that both the AECA's text and purpose support the government's position, it is no surprise that this court's precedent lends no support to Bishop's stance. In United States v. Hsu, we upheld convictions for AECA export violations against an as-applied void-for-vagueness challenge. We rejected in passing a defendant's argument that "the government presented insufficient evidence . . . that [the defendant] acted 'willfully' because of the asserted lack of evidence that [he] knew the [exported items] were on the [USML] or military items." Hsu, 364 F.3d at 198 n.2 (internal quotation marks omitted). We noted that "[w]hatever specificity on 'willfulness' is required, it is clear that this extremely particularized definition finds no support in the case law." Id.

We draw further support from decisions of other circuits that have squarely considered the issue. See United States v. Roth, 628 F.3d 827, 835 (6th Cir. 2011) ("[S]ection 2778(c) does

16

not require a defendant to know that the items being exported are on the Munitions List.  Rather, it only requires knowledge that the underlying action is unlawful."); United States v. Tsai, 954 F.2d 155, 162 (3d Cir. 1992) ("If the defendant knew that the export was in violation of the law, we are hard pressed to say that it matters what the basis of that knowledge was."); United States v. Murphy, 852 F.2d 1, 7 (1st Cir. 1988) (upholding a jury instruction that "made clear that conviction [under the AECA] would not require evidence that defendants knew of the licensing requirement or were aware of the munitions list").

Bishop argues, unconvincingly, that the weight of circuit authority cuts in his favor.  Many of the opinions Bishop cites in his defense are inapposite, as they merely indicated that jury instructions as to the defendant's knowledge of the USML were sufficient without indicating that the specific instructions were required.  See United States v. Smith, 918 F.2d 1032, 1037-38 (2d Cir. 1990); United States v. Gregg, 829 F.2d 1430, 1437 n.14 (8th Cir. 1987); see also Murphy, 852 F.2d at 7 n.6 (reading Gregg as not requiring knowledge of the contents of the USML to sustain a conviction under the AECA). Moreover, the great bulk of the authority on which Bishop relies either fails to support his position or, to the extent that it

17

does, antedates the Supreme Court's analysis of willfulness requirements in Bryan.

Bishop appears to recognize that the law is against him when he argues that, even if defendants do not generally need to know whether a particular item is on the USML for criminal liability under the AECA, such knowledge is necessary on the "narrow facts of this case." Appellant's Reply Br. at 4. Bishop grounds this contention in the fact that his shipment contained a mix of ammunition, some of which was on the USML (and thus covered by the AECA) and some of which was not. Thus, he argues, the only way he could have known that his conduct was illegal was if he knew that 9mm and 7.62X39mm ammunition were on the USML. If, as the district court found, Bishop believed that the "ammunition couldn't be shipped" and "he knew what he was doing was unlawful," he would necessarily have believed that exporting each type of ammunition -- 9mm and 7.62X39mm included -- was illegal as well. Under the standard of willfulness described above, his true belief as to the illegality of transporting the 9mm and 7.62X39mm ammunition is sufficient to establish culpability under the AECA even if unaccompanied by knowledge of the contents of the USML.

18

B.

Having established that willfulness under the AECA requires only general knowledge of illegality, we now turn to Bishop's argument that there was insufficient evidence to conclude that he knew his actions were illegal rather than merely violations of State Department policy. "In assessing the sufficiency of the evidence presented in a bench trial, we must uphold a guilty verdict if, taking the view most favorable to the Government, there is substantial evidence to support the verdict." Elliott v. United States, 332 F.3d 753, 760-61 (4th Cir. 2003). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

In reviewing the district court's judgment, we are mindful that, as the trier of fact, that court was in a better position than we are to evaluate the credibility of witnesses, take into account circumstances, and make reasonable inferences. Thus we reverse on sufficiency grounds only where "the prosecution's failure is clear." Burks v. United States, 437 U.S. 1, 17 (1978). Bishop consequently carries a "heavy burden" on his appeal of this issue. United States v. Hoyte, 51 F.3d 1239, 1245 (4th Cir. 1995).

19

Bishop argues that the government's evidence fails to satisfy even its own interpretation of the willfulness requirement. He contends that neither the email sent by the shipping company Paxton to Bishop's wife, nor the training and notifications he received as a State Department employee, explicitly stated that transporting ammunition was <u>illegal</u>, rather than merely against State Department policy. Bishop also cites evidence that the legal prohibition on exporting certain ammunition was not well known: Mette Beecroft's apparent lack of knowledge as to why the State Department prohibited shipping ammunition; a State Department official's testimony that a typical law-enforcement officer would likely not know about the prohibition; Luis Roque's need for legal guidance after he discovered that Bishop had attempted to transport ammunition; and the embassy's policy of permitting FSOs to keep ammunition in their homes.

While admittedly probative of Bishop's knowledge (or lack thereof) of the legality of his actions, this evidence is substantially outweighed by that presented by the government, which we must view on appeal in the light most favorable to the prosecution.

First, Bishop was thoroughly trained in the rules and regulations surrounding the State Department's transportation policies. He was required to attend training that warned him

against transporting ammunition and was provided with numerous documents that not only informed him that transporting ammunition was prohibited but also referenced the AECA and explained that violations could be punished by imprisonment. These documents included the FAM and the "It's Your Move" manual, and specifically referenced criminal, rather than merely administrative, prohibitions and penalties. Bishop also received an email from Paxton reiterating that he could not transport ammunition, and was told explicitly by a DSS agent prior to his trip to Alabama that he could not keep firearms in Jordan. Moreover, as befits an FSO charged with the financial management of a U.S. embassy abroad, Bishop's own witness characterized him as skilled at following complex legal rules and performing sophisticated independent legal research. Even without the substantial evidence of Bishop's deception, discussed below, the gravity of the penalties he was repeatedly warned about make it highly unlikely that Bishop believed that shipping ammunition was a simple breach of State Department policy, rather than a violation of federal law and regulation.

Moreover, Bishop engaged in numerous acts of deception that clearly indicated his awareness of wrongdoing. Although he claims to have told the Paxton packers that some of the boxes contained "bullets," he falsely described the boxes as generally containing weights and actively deceived by failing to include

21

ammunition on inventory lists that he signed. Bishop quibbles that the packers, rather than he, listed weights on the inventory, Appellant's Reply Br. at 1, but this assertion ignores the fact that Bishop packed many of the boxes himself and knowingly signed an inaccurate inventory as well as a declaration that he was not transporting hazardous or explosive items. When Paxton informed him that it had found ammunition in his shipment, his first instinct was to ask if the State Department knew how much ammunition he had tried to ship. He changed his story about why he attempted to ship the ammunition, first asserting that it was intended as a gift and later that it was meant for his own recreational use. Finally, when interviewed by DSS agents, he admitted to deception the year before about not having a firearm in Jordan in violation of mission policy.

The district court concluded that Bishop "knew from the time he was employed at the State Department that this ammunition couldn't be shipped. He'd been reminded continually over the years. I think it's clear. I find the evidence is clear that he knew what he was doing was unlawful and simply went ahead and did it." We agree. But even if we disagreed with the district court's conclusion that Bishop violated a known legal duty in attempting to export the ammunition, we would not be, on this record, in a position to disturb it. As

22

we have explained, "The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." See United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). That standard is plainly satisfied here.

## III.

For the foregoing reasons, we find that there was sufficient evidence to support the district court's conclusion that Bishop willfully violated the AECA. We therefore affirm his conviction.

AFFIRMED