15-3814-cr
*United States of America v. Mark Henry*

# In the
# United States Court of Appeals
## for the Second Circuit

————

AUGUST TERM 2017
No. 15-3814-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

MARK HENRY, AKA WEIDA ZHENG, AKA SCOTT RUSSEL, AKA BOB
WILSON, AKA JOANNA ZHONG
*Defendant-Appellant*.[*]

————

Appeal from the United States District Court
for the Eastern District of New York.

————

ARGUED: SEPTEMBER 13, 2017
DECIDED: APRIL 26, 2018

————

Before: JACOBS, CABRANES, and WESLEY, *Circuit Judges*.

————

[*] The Clerk of Court is directed to amend the official caption as set forth above.

Defendant-Appellant Mark Henry ("defendant" or "Henry") appeals the November 25, 2015 judgment of the United States District Court for the Eastern District of New York (Roslynn R. Mauskopf, *Judge*) convicting him after jury trial of one count of conspiracy to violate and one count of violating, attempting to violate, and aiding and abetting the violation of the Arms Export Control Act ("AECA"), 22 U.S.C. §§ 2778(b)(2), (c).

Five questions are presented on appeal: (1) whether the AECA unconstitutionally delegates legislative authority to the executive; (2) whether the District Court erred in instructing the jury on the conduct required to find "willfulness"; (3) whether the District Court erred in instructing the jury on "conscious avoidance"; (4) whether the District Court violated Henry's rights under the Sixth Amendment and the Court Interpreters Act ("CIA"), 28 U.S.C. §§ 1827–28, to waive the assistance of an interpreter; and (5) whether the District Court abused its discretion in requiring that Henry be provided the assistance of a court-appointed Mandarin interpreter throughout trial.

We answer all five questions in the negative and therefore **AFFIRM** the District Court's judgment of conviction.

---

AIMEE HECTOR, Special Assistant United States Attorney, (Michael Lockard, Special Assistant United States Attorney, *on the brief*), *for* Richard P.

2

Donoghue, United States Attorney for the Eastern District of New York, New York, NY, *for Appellee*.

MARC FERNICH, Law Office of Marc Fernich, New York, NY, *for Defendant-Appellant*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

Defendant-Appellant Mark Henry ("defendant" or "Henry") appeals the November 25, 2015 judgment of the United States District Court for the Eastern District of New York (Roslynn R. Mauskopf, *Judge*) convicting him after jury trial of one count of conspiracy to violate and one count of violating, attempting to violate, and aiding and abetting the violation of the Arms Export Control Act ("AECA"), 22 U.S.C. §§ 2778(b)(2), (c).

Five questions are presented on appeal: (1) whether the AECA unconstitutionally delegates legislative authority to the executive; (2) whether the District Court erred in instructing the jury on the conduct required to find "willfulness"; (3) whether the District Court erred in instructing the jury on "conscious avoidance"; (4) whether the District Court violated Henry's rights under the Sixth Amendment and the Court Interpreters Act ("CIA"), 28 U.S.C. §§ 1827–28, to waive the assistance of an interpreter; and (5) whether the District Court abused its discretion in requiring that Henry be provided the assistance of a court-appointed Mandarin interpreter throughout trial.

We answer all five questions in the negative and therefore **AFFIRM** the District Court's judgment of conviction.

## I.     BACKGROUND

Because Henry is appealing a judgment of conviction entered after trial, we view the facts from the trial record in the light most favorable to the government.[1]

### A. Henry's Arms Export Business

Henry ran an arms export business—Fortune Tell, Ltd. ("Fortune Tell")—out of his home in Flushing, Queens. At least four times between 2009 and 2012, Henry bought "ablative materials"—a military technology used in rockets and missiles—from an American distributor, Krayden, Inc. ("Krayden"), and exported them to a customer in Taiwan. The customer was buying the materials on behalf of the Taiwanese military.

The export of ablative materials requires a license issued by the Directorate of Defense Trade Controls ("DDTC") of the United States Department of State. This requirement is part of a comprehensive regulatory framework established by the AECA, which in turn authorizes the President of the United States to implement rules

---

[1] *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

regarding the export and control of "defense articles."[2] The ablative materials Henry exported are considered "defense articles" under the AECA.[3] It is a crime to violate the AECA or any of the rules and regulations promulgated thereunder.[4]

The jury found that Henry exported or attempted to export ablative materials despite not having the required DDTC export license. According to the evidence presented at trial, Krayden prominently displayed information regarding the need for an export license in its communications with Henry. Henry and his customer in Taiwan also repeatedly discussed the export license requirement through email correspondence. Instead of acquiring the license,

---

[2] *See generally* 22 U.S.C. § 2278.

[3] *See* 22 C.F.R. § 121.1 Category XIII(d)(1) (2017); *see also id.* Category IV(f) (2009); Supplemental App. 245.

[4] 22 U.S.C. § 2278(c) ("Any person who willfully violates any provision of this section, section 2779 of this title, a treaty referred to in subsection (j)(1)(C)(i), or any rule or regulation issued under this section or section 2779 of this title, including any rule or regulation issued to implement or enforce a treaty referred to in subsection (j)(1)(C)(i) or an implementing arrangement pursuant to such treaty, or who willfully, in a registration or license application or required report, makes any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined for each violation not more than $1,000,000 or imprisoned not more than 20 years, or both.").

Henry sought to conceal from Krayden the fact that he intended to export the ablative materials.

Henry tried to conceal his conduct in different ways. In one instance, when purchasing the ablative materials, he provided Krayden the address of a freight forwarder by the name of AE Eagle, which would in turn ship the materials to Fortune Tell. Instead of identifying the address as belonging to AE Eagle, however, Henry claimed that the address belonged to a fictitious company— "UDMC Corporation"—in an attempt to disguise that the actual recipient was, in fact, a freight forwarder that would export the materials outside of the United States.

He also created false documentation in an effort to conceal from United States customs authorities the identity of the materials he was exporting, repeatedly referring to the contents of the shipments by names that obscured the fact that the packages contained ablative materials.

Henry sometimes used his true name when placing these orders. At other times, he placed orders under "Scott Russel," "Weida Zheng," or "DaHua Electronics Corp." Each of these orders was intended for Fortune Tell.

In addition to his dealings with Krayden, Henry ordered two microwave amplifiers from Amplifier Research Corp. ("Amplifier"), a United States manufacturer, in 2012. Because such devices serve both military and commercial purposes, exporting them overseas requires an additional license from the U.S. Department of

Commerce. Henry did not obtain the required licenses before attempting to ship the two amplifiers to mainland China. He also repeatedly provided the wrong end user address to Amplifier to obtain a lower price available only for end users who reside in the United States. In its correspondence with Henry, Amplifier made clear that the materials sold were subject to the AECA.

Although it did send the requested products to Henry, Amplifier alerted law enforcement when it learned of Henry's efforts to disguise the end user. Henry was arrested after he had received the materials but before he had shipped them to China.

He was indicted on one count of conspiracy to violate the AECA, 22 U.S.C. §§ 2778(b)(2) & (c), Title 18, United States Code, Section 371; one count of violating, attempting to violate, and aiding and abetting the violation of the AECA, Title 22, United States Code, §§ 2278(b)(2) and (c) and Title 18, United States Code, Section 2; and a third count of attempting to violate the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1705.

### B. Trial Testimony

At trial, Henry testified he did not know that he was required to obtain a license for any of the materials he exported or sought to export. Some of his testimony was contradictory. While he admitted to being aware generally of export restrictions on certain materials, he denied ever having seen the export license warnings displayed repeatedly in correspondence with Krayden and Amplifier. He also asserted that his father had placed some of the orders with Krayden

7

and had otherwise handled all the email correspondence with the company's representatives, so that Henry himself would not have been aware of any notice of export restrictions contained in that correspondence.

Henry nevertheless admitted to reading correspondence in which the manufacturer or distributor highlighted the need for an export license, and admitted that he at times submitted incorrect end user information to obtain a lower price for certain materials. He testified that his misrepresentations to Krayden, Amplifier and United States customs authorities were for purposes other than to conceal his effort to export defense articles in violation of the AECA.

Henry's father, Xinhao Zheng, also testified. He confirmed his son's representations and stated that he would often place orders and correspond with manufacturers and distributors using his son's name and email address.

## C. Use of an Interpreter

On the morning of the first day of trial, Henry, who is originally from China, requested to proceed without the use of a Mandarin interpreter. Henry testified that although he spoke English, he principally wrote and spoke in Mandarin. He admitted that he always used Google Translate when writing emails to manufacturers or distributors, and that he also used Google Translate while placing orders. Henry had used an interpreter in all pretrial proceedings but now wished to proceed without one because he believed the use of an

interpreter would diminish his credibility and prejudice the jury against him.

To assess the need for an interpreter, the District Court inquired about Henry's facility with the English language. After extensive discussion with Henry's lawyer and Henry himself about his ability to speak and understand English, the District Court concluded that, because of the technical nature of some of the evidence likely to be presented, Henry would be provided the assistance of a court-appointed Mandarin interpreter throughout the trial. As a compromise with Henry, the District Court made one exception to this rule. It permitted Henry to testify in English with the assistance, as necessary, of a standby interpreter, an option of which he took advantage during his testimony.

### D. Conviction and Sentence

The jury returned a verdict of guilty as to the two AECA counts on July 2, 2014, and it acquitted Henry on the IEEPA count.[5] Henry filed a motion for a new trial on August 1, 2014.[6] It was denied on February 27, 2015.[7] Judge Mauskopf sentenced Henry principally to a term of imprisonment of 78 months on November 24, 2015.[8]

---

[5] *See* 13 Cr. 91, Dkt. No. 59.

[6] Dkt. No. 70.

[7] Dkt. No. 77.

[8] *Id.*, Dkt. No. 94.

## II. DISCUSSION

## A. Constitutionality of the Arms Export Control Act

Henry first challenges the sufficiency of the evidence presented at trial, but this argument is more accurately understood as a challenge to the constitutionality of the AECA.[9] In his view, the provisions of the AECA authorizing the President to designate certain goods as "defense articles" are an unconstitutional delegation both because of their vagueness and because the AECA's statutory and regulatory scheme imposes criminal penalties on violators.

We hold, in agreement with the other circuits that have considered the issue,[10] that the AECA does not unconstitutionally delegate legislative authority to the executive.

### 1.

Congress is constitutionally prohibited from delegating its legislative authority to another branch of Government.[11] However, courts have recognized certain exceptions to this rule, with the

---

[9] *See* Def. Br. at 12 ("[T]he State Department has no fixed or prescribed method . . . for classifying given articles as defense objects subject to the Munitions List.").

[10] *See United States v. Chi Tong Kuok*, 671 F.3d 931, 938–39 (9th Cir. 2012); *United States v. Hsu*, 364 F.3d 192, 204–05 (4th Cir. 2004).

[11] *Touby v. United States,* 500 U.S. 160, 165 (1991).

understanding that "Congress simply cannot do its job absent an ability to delegate power under broad general directives."[12] The Supreme Court has sanctioned Congress's authority, in enacting legislation, to "give to those who [are] to act under such [legislation] 'power to fill up the details' by the establishment of administrative rules and regulations."[13] The Court has allowed for such delegation even where violations of such regulations result in serious criminal penalties.[14]

When Congress delegates authority to the Executive, it must "lay down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform."[15] An "intelligible principle" is a principle that "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."[16]

---

[12] *Mistretta v. United States*, 488 U.S. 361, 372 (1989).

[13] *United States v. Grimaud*, 220 U.S. 506, 517 (1911); *Mistretta*, 488 U.S. at 372 ("We also have recognized, however, that the separate-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches.").

[14] *Grimaud*, 220 U.S. 506.

[15] *Mistretta*, 488 U.S. at 372 (1989) (alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928)).

[16] *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946); *see also Mistretta*, 488 U.S. at 372–73.

Courts have only twice found a delegation of legislative power to violate the "intelligible principle" standard.[17] Moreover, a delegation of legislative authority to the executive is accorded special deference if it concerns foreign affairs. This deference is justified by the "degree of discretion and freedom" that the executive requires to conduct foreign relations effectively.[18] The Supreme Court has suggested that a delegation of legislative authority to the executive that would otherwise be unconstitutional could be held valid if "its exclusive aim [were] to afford a remedy for a hurtful condition within foreign territory."[19]

---

[17] *See A.L.A Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) (C.E. Hughes, C.J., in a unanimous opinion, striking down delegation to industry associations comprised of private individuals to create legally binding codes of "fair competition"); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) (striking down blanket delegation to President to criminalize the interstate transport of petroleum); *see also United States v. Dhafir*, 461 F.3d 211, 215 (2d Cir. 2006) (observing that "the Supreme Court has struck down only two statutes as impermissible delegations").

[18] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *see also Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.").

[19] *Curtiss-Wright*, 299 U.S. at 315.

We review the constitutionality of the AECA *de novo,* as we would any other federal statute.[20]

2.

The AECA, in relevant part, authorizes the President—"[i]n furtherance of world peace and the security and foreign policy of the United States"—to compile the United States Munitions List ("USML"), which is to be comprised of goods and services that he designates as "defense articles and defense services."[21] The AECA also authorizes the President "to promulgate regulations for the import and export of such articles and services."[22] Any good or service placed on the USML cannot be imported or exported except by license,[23] and the statute imposes criminal penalties on violators.[24] The President has in turn delegated the authority to compile the USML and to grant or deny applications for export licenses to the Secretary of State.[25]

---

[20] *United States v. Pettus*, 303 F.3d 480, 483 (2d Cir. 2002).

[21] 22 U.S.C. § 2278(a)(1).

[22] *Id.*

[23] *Id.* § 2278(b)(2).

[24] *Id.* § 2278(c).

[25] *See* 22 C.F.R. § 120.2.

As promulgated pursuant to this authority, the USML sets forth twenty categories of "defense articles." For each category, it enumerates a list of specific defense-related materials subject to regulation under the AECA.[26] The ablative materials and microwave amplifiers that Henry exported or attempted to export are among the "defense articles" enumerated in the USML.[27]

These provisions of the AECA satisfy the intelligible principle standard. The statute first delineates a general policy to guide the actions of the executive: "furtherance of world peace and the security and foreign policy of the United States."[28] It charges the President with applying that policy by compiling the USML and promulgating the associated regulations. It also establishes clear boundaries for this authority. The statute limits the President's discretion to defining a list of defense-related goods and services that are subject to export control and to promulgating license regulations. It further constrains this discretion by requiring the President to conduct periodic reviews of the USML to determine which goods and services no longer require export control.[29] The President must report on those reviews to

---

[26] *See id.* § 121.1.

[27] *See id.* §§ 121.1 Category XIII(d)(1), Category XV(e)(14) (2017); §§ 121.1 Category IV(f), Category XV(e)(1) (2009).

[28] 22 U.S.C. § 2778(a)(1).

[29] *Id.* § 2778(f)(1).

Congress, and if he wishes to amend the USML, he may do so only after a thirty-day waiting period.[30]

Henry's challenge to the AECA is analogous to that raised by the defendant in *United States v. Dhafir*.[31] The defendant in *Dhafir*, after being convicted of violating the IEEPA by transferring funds to one or more persons in Iraq, argued that the law violated the non-delegation doctrine. We held the IEEPA to be constitutional, for reasons that guide our analysis here.

The IEEPA grants the President the power to "investigate, regulate, or prohibit" various commercial activities including: [i] "any transactions in foreign exchange," [ii] "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and [iii] "the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States. . . ."[32] Violations of the IEEPA result in criminal penalties similar to those imposed under the AECA. We found that the IEEPA conformed to the intelligible principle standard because the statute "meaningfully constrains the

---

[30] *Id.* §§ 2778(f)(1), (2).

[31] 461 F.3d 211 (2d Cir. 2006).

[32] 50 U.S.C. § 1702(a)(1)(A).

President's discretion," requires periodic review by Congress, and relates to foreign affairs.[33]

Importantly, the section of the IEEPA at issue in *Dhafir* involved an arguably broader delegation of Congressional power than the provisions of the AECA at issue here. In *Dhafir*, we upheld the IEEPA's "criminal provisions"—the statute's grant of authority to the President to specifically "define conduct as criminal for an unlimited time once a national emergency is declared,"[34] a more sweeping delegation than the authority to subject certain materials to export licensure. Moreover, whereas the AECA touches only the defense sector, the IEEPA authorizes the President to prohibit virtually any commercial transaction that, in his judgment, threatens national security.[35]

Henry nonetheless argues that the length and complexity of the USML render it, and consequently the AECA, unconstitutionally vague. This argument is without merit. The ablative materials Henry exported or attempted to export were unambiguously included in the USML during the time of his offense conduct.[36] Henry was also made

---

[33] *Dhafir*, 461 F.3d at 216-17.

[34] *Id.* at 217 (internal quotation marks omitted).

[35] *Id.* at 216-217.

[36] *See* 22 C.F.R. § 121.1 Category IV(f) (2009) (including "[a]blative materials fabricated or semi-fabricated from advanced composites (e.g., silica, graphite, carbon, carbon/carbon, and boron filaments) for the articles in this category that

aware by several emails, both from the distributor in the United States and his customer in Taiwan, that ablative materials were included in the USML. Henry's conduct was clearly proscribed by the applicable statute and regulations, and he knew it.

We thus conclude that the AECA does not unconstitutionally delegate legislative authority to the executive. The statute is neither violative of the "intelligible principle" standard nor unconstitutionally vague.

### B. Jury Instructions

Henry argues that the District Court erred in instructing the jury on both willfulness and conscious avoidance. On willfulness, Henry contends that the District Court erred by failing to instruct the jury that the government had to prove not only that he knew that his conduct was illegal, but also that he knew *why* it was illegal: that is, because the items he attempted to export were listed on the USML. On conscious avoidance, Henry argues that instruction to the jury on the concept of conscious avoidance permitted the jury to find him guilty on a standard of gross negligence or recklessness instead of the required higher standard of willfulness.

---

are derived directly from or specifically developed or modified for defense articles").

We review challenges to jury instructions *de novo*, but we will not find reversible error unless the charge either "failed to inform the jury adequately of the law or misled the jury as to the correct legal rule."[37]

### 1. "Willfulness"

#### a.

We consider the question of willfulness in light of *United States v. Bryan*.[38] In *Bryan*, the Supreme Court approved the following definition of willfulness: "[a] person acts willfully if he acts intentionally and purposely with the intent to do something the law forbids, that is, with the bad purpose to disobey or disregard the law."[39] The Court further held that a person who acts willfully need not be aware of the specific law that his conduct may be violating. Rather, "knowledge that the conduct is unlawful is all that is required."[40] Knowledge of the specific law that one is violating has been required only where a "highly technical statute[ ]"—such as a

---

[37] *United States v. Alfisi*, 308 F.3d 144, 148 (2d Cir. 2002).

[38] 524 U.S. 184 (1998).

[39] *Id.* at 190 (internal quotation marks omitted).

[40] *Id.* at 196.

provision of the Internal Revenue Code—prohibits "apparently innocent conduct."[41]

**b.**

Here, the District Court instructed the jury as follows:

> The fourth and final element that the government must prove, is that the defendant acted knowingly and willfully. A person acts knowingly if he acts intentionally and voluntarily and not because of ignorance, mistake, accident, or carelessness. Willfully means to act with knowledge that one's conduct is unlawful and with the intent to do something that the law forbids. That is to say, with a bad purpose, either to disobey or disregard the law. The defendant's conduct was not willful if it was due to negligence, inadvertence, or mistake. However, it is not necessary for the government to prove that the defendant knew the precise terms of the statute or regulatory provision he is charged with violating—that is, the government is not required to prove that the defendant knew the existence or details of the Arms Export Control Act or the related regulations. All that is required is that the government prove that the defendant acted with the intent to disobey or disregard the law.[42]

The District Court's instruction correctly and clearly stated the definition of willfulness in the circumstances presented. It noted, pursuant to *Bryan*, that willfulness requires only that the defendant

---

[41] *Id.* at 194.

[42] J.A. 174.

know that what he was doing was illegal, and not that he know that his conduct was prohibited under a specific AECA provision or related regulation.[43]

Moreover, the heightened definition of willfulness applicable to "highly technical statutes" does not apply here. The cases on which defendant relies—*Ratzlaf v. United States* and *Cheek v. United States*—concern tax and financial regulation statutes so complicated and non-intuitive that one might violate them without actually understanding that his conduct was illegal.[44]

These cases are exceptions to the hoary principle that ignorance of the law is not a valid defense, and the AECA is not such an exception. Regardless of whether Henry was aware of the items contained in the United States Munitions List, or of the specific provisions of the AECA that he was alleged to have violated, neither the list nor the statute is unclear. Where it is proven beyond a reasonable doubt that

---

[43] We have already rejected a similar argument raised by the defendant in *United States v. Homa Int'l. Trading Corp.*, 387 F.3d 144 (2d Cir. 2004). In *Homa*, the defendant argued that the district court erred in instructing the jury that it need only find an intention to violate the Iran embargo, rather than the specific provisions of the IEEPA which, at the time, forbade U.S. citizens from trading with Iran. Relying principally on *Bryan*, we held that the government need only prove that the defendant knew that his conduct violated the Iran embargo generally, and not because he also knew that his conduct ran afoul of Sections 1702 and 1705(b) of the IEEPA.

[44] 510 U.S. 135 (1994); 498 U.S. 192 (1991).

a defendant is generally aware of export license requirements for military-grade materials, there is no risk of criminalizing otherwise innocent conduct on a mere technicality. Unsurprisingly, no other court to have considered the AECA's willfulness requirement has applied the rule of those exceptional cases to this statute.[45]

We also reject Henry's suggestion that the District Court's instruction ran afoul of the letter and purpose of the AECA. "The AECA's language and structure make clear that Congress struck a balance between punishing those who intentionally violate the law and ensnaring individuals who make honest mistakes."[46] The statute's willfulness requirement eliminates "any genuine risk of holding a person criminally responsible for conduct which he could not reasonably understand to be proscribed."[47]

We conclude that the AECA's willfulness provision requires only that a jury find that the defendant violated a known legal duty and not that he knew specifically of the USML or of any other provision

---

[45] *See United States v. Bishop*, 740 F.3d 927, 933–34 (4th Cir. 2014); *United States v. Chi Mak*, 683 F.3d 1126, 1138 (9th Cir. 2012); *United States v. Roth*, 628 F.3d 827, 834–35 (6th Cir. 2011); *United States v. Tsai*, 954 F.2d 155, 162 (3d Cir. 1992); *United States v. Murphy*, 852 F.2d 1, 7 (1st Cir. 1988).

[46] *Bishop*, 740 F.3d at 933.

[47] *Id.* (internal quotation marks omitted).

of the AECA that imposed that duty. The District Court's willfulness instruction was therefore not erroneous.

## 2. "Conscious Avoidance"

### a.

A conscious avoidance charge may only be given "(i) when a defendant asserts the lack of some specific aspect of knowledge required for conviction, and (ii) the appropriate factual predicate for the charge exists, *i.e.*, the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."[48] The conscious avoidance charge "must communicate two points: (1) that a jury may infer knowledge of the existence of a particular fact if the defendant is aware of a high probability of its existence, (2) unless the defendant actually believes that it does not exist."[49]

---

[48] *United States v. Quattrone*, 441 F.3d 153, 181 (2d Cir. 2006) (internal citation and quotation marks omitted); *see also United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986) (explaining that a conscious avoidance instruction is appropriate when a defendant claims to lack "some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance").

[49] *United States v. Kaiser*, 609 F.3d 556, 566 (2d Cir. 2010) (internal quotation marks omitted).

## b.

Henry's principal defense at trial was that he was not aware of the AECA's export license requirements. He repeatedly testified that he had not seen or read notices of the export license restrictions that were contained in his correspondence with Krayden and Amplifier. His father testified in support of this argument, noting that he often corresponded with Krayden using his son's name and email address so that, in effect, he was the only one who was made aware of the licensing requirements. The testimony of Henry and his father attempted to build a factual predicate in support of an ignorance defense. Accordingly, a conscious avoidance charge was entirely appropriate.

Moreover, the conscious avoidance charge given by the District Court was proper. The District Court gave the following instruction:

> In determining whether the defendant acted knowingly and willfully, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him. If you find beyond a reasonable doubt that the defendant acted with a conscious purpose to avoid learning the truth that exporting the ablative material without a license was unlawful, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken.
>
> If you find that the defendant was aware of a high probability that exporting the ablative materials without

a license was unlawful and that the defendant acted with deliberate disregard of that fact, you may find that the defendant acted knowingly and willfully. However, if you find that the defendant actually believed that exporting the ablative material without a license was lawful, he may not be convicted. It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.[50]

In defining the concept of conscious avoidance, the District Court made it clear that the jury could find that Henry acted knowingly if it found that he consciously avoided "learning that the export of ablative materials without a license was unlawful."[51] The District Court also properly explained to the jury that although a finding of conscious avoidance may be a substitute for actual knowledge, it cannot substitute for the finding of the element of "willfulness" necessary to prove the crimes charged.[52] It did so by emphasizing that mere negligence or recklessness, coupled with conscious avoidance, was not enough to convict.[53] It also did so by properly instructing the

---

[50] J.A. 174–75.

[51] *Id.*

[52] *Cf. United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1195–96 (2d Cir. 1989) (rejecting claims that conscious avoidance charge was improperly applied to a finding of criminal intent).

[53] *Cf. id.*; *see also United States v. Friedman*, 300 F.3d 111, 125 (2d Cir. 2002).

24

jury on the separate concept of "willfulness" and by properly explaining that in order to find that defendant acted willfully, the jury had to find both that defendant acted with knowledge that his conduct was unlawful *and* with the intent to do something that the law forbids.

*       *       *

We thus hold, in agreement with four of our sister circuits,[54] that the District Court's willfulness instruction was not erroneous, because the AECA does not require that a defendant have known specifically of the USML or of any other provision of the Act. We also hold that a conscious avoidance instruction was appropriate in Henry's case and that the instruction given by the District Court was correct because that charge made clear to the jury that it was still required to find that the defendant acted willfully.

## C. Waiver of the Use of a Court-Appointed Interpreter

Finally, Henry argues that the District Court's requirement that he use a Mandarin interpreter violated his rights under the Sixth Amendment and the Court Interpreters Act, or CIA, of 1978.[55] First, he contends that the Sixth Amendment and the CIA afford him an

---

[54] *See Bishop*, 740 F.3d at 933–34; *Chi Mak*, 683 F.3d at 1138; *Roth*, 628 F.3d at 827; *Tsai*, 954 F.2d at 155; *Murphy*, 852 F.2d at 7.

[55] *See* U.S. Const., amend. VI; 28 U.S.C. § 1827(d)(1).

absolute right to waive the use of an interpreter. Next, he argues that even if the right to waive the use of an interpreter is not absolute, the District Court abused its discretion under the CIA by requiring that Henry use an interpreter while testifying.

We review *de novo* district court interpretations of the Constitution and of federal statutes.[56]

**1. The right to waive use of a court-appointed interpreter is not absolute**

**a.**

Both the Sixth Amendment and the CIA guarantee a criminal defendant the right to use of an interpreter. Nearly half a century ago, in *United States ex rel. Negron v. New York*, we held that the Sixth Amendment affords a criminal defendant the "right to have a competent translator assist him, at state expense if need be, throughout his trial."[57] We have not had occasion to define the scope of this right since *Negron*.

Relatedly, the CIA provides, in relevant part, for court appointment of an interpreter:

---

[56] *See United States v. Quinones*, 313 F.3d 49, 60 (2d Cir. 2002) (constitutional interpretation); *Pettus*, 303 F.3d at 483 (constitutionality of federal statute).

[57] *United States ex rel. Negron v. New York*, 434 F.2d 386, 91 (2d Cir. 1970).

The presiding judicial officer (1) . . . shall utilize the services of the most available certified interpreter . . . in judicial proceedings instituted by the United States, if the presiding judicial officer determines . . . that [a] party (including a defendant in a criminal case), or a witness who may present testimony in such judicial proceedings—

(A) speaks only or primarily a language other than the English language; or

(B) suffers from a hearing impairment (whether or not suffering also from a speech impairment)

so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.[58]

The CIA also affords a defendant the right to waive the use of a court-appointed interpreter.[59] The statute provides that a defendant may waive his statutory right to an interpreter if (1) the waiver is made "expressly by such individual on the record" by the party, (2) "after opportunity to consult with counsel," (3) the presiding judge

---

[58] 28 U.S.C. § 1827(d)(1).

[59] *Id.* § 1827(f)(1).

has explained to the defendant "the nature and effect of the waiver," and (4) the waiver is "approved by the presiding judicial officer."[60]

We have yet to squarely address the effect of the requirement of district court approval on the scope of the waiver. Our cases indicate, however, that a defendant's right to waive the use of an interpreter is not absolute, and that a defendant's waiver request need not be honored when the court finds a compelling reason to deny it.

In *United States v. Moon*,[61] the defendant argued that the district court violated the CIA and his Sixth Amendment right to present a full defense when it forced him to use a court-appointed and court-certified interpreter instead of an interpreter of his own choosing.[62] Moon moved pursuant to § 1827(f) of the CIA to waive the use of a court-certified interpreter. The district court ruled that Moon was free to use the interpreter of his own choice for purposes of translating for him the proceedings of the trial, but that if Moon elected to testify, his testimony would have to be translated by a court-certified

---

[60] *Id.*

[61] 718 F.2d 1210 (2d Cir. 1983).

[62] The CIA specifies that when an interpreter is necessary, the district court is to appoint an interpreter who has been previously "certified" as a competent and qualified interpreter by the Administrative Office of the United States Courts. 18 U.S.C. § 1827(b)(1). The program through which interpreters become "court-certified" is devised and maintained by the Director of the Administrative Office of the United States Courts. *Id.* A district court is permitted to appoint a non-court-certified, but otherwise qualified interpreter, "[o]nly in a case in which no certified interpreter is reasonably available." 28 U.S.C. § 1827(b)(2).

interpreter.[63] Purportedly because of this restriction, Moon elected not to testify at his own trial.[64] He argued, as Henry does here, that the district court's action violated his absolute right under the CIA and the Sixth Amendment to waive the use of a court-appointed interpreter.

We rejected Moon's argument. We held that the court's requirement that Moon use a court-appointed and court-certified interpreter while testifying, despite Moon's expressed desire to proceed without one, violated neither the CIA nor the defendant's Sixth Amendment fair trial right. We reasoned that, "even [if] requiring Moon to use a court-appointed interpreter [can] be viewed as some restriction on his ability to present a full defense, . . . not all restrictions on a defendant's right to testify are *per se* impermissible"[65] and that certain restrictions on a defendant's right to testify in the language he wishes are "sanctioned where reasonably necessary to the achievement of a fair trial."[66]

Similarly, in *United States v. Huang*,[67] the district court declared a mistrial, over the defendant's objection, because it found that the

---

[63] 718 F.2d at 1231.

[64] *Id.* at 1232.

[65] *Id.* at 1231.

[66] *Id.*

[67] 960 F.2d 1128 (2d Cir. 1992).

interpreter being used was not court-certified. Because the defendant expressed a desire to waive his right to a court-certified interpreter and proceed with trial, he appealed the mistrial order.[68]

We held in *Huang* that it was improper for the district court to declare a mistrial without first analyzing the appropriateness of the defendant's waiver. We noted that the district court should have analyzed whether there was a "sound ground on which it could properly reject" the defendant's request for waiver before declaring a mistrial well into the trial.[69] We went on to observe that we "[did] not mean to suggest that a defendant who waived his own objection to a translation that was materially deficient could thereby force the continuation of the trial to the prejudice of the government and the public," and that when a trial was arguably compromised by defendant's invocation of waiver, rejection of the waiver might be "required in the interests of justice."[70]

**b**.

We conclude from these cases that although the Sixth Amendment and the CIA afford a defendant a qualified right to waive the use of an interpreter, the district court has discretion to determine whether

---

[68] *See id.* at 1135–36.

[69] *Id.* at 1136.

[70] *Id.*

waiver is reasonable under the circumstances presented; neither the Sixth Amendment nor the CIA grants an absolute right to waive use of an interpreter at trial proceedings. Moreover, we conclude that the applicable standard of review of a judge's decision on waiver is "abuse of discretion."[71]

Requiring a defendant to use an interpreter when the district court properly finds that one is necessary does not inhibit the defendant's ability to mount a successful defense. Rather, it ensures that "whatever testimony a defendant gives is honestly reported,"[72] and that the court has taken the necessary steps to safeguard the defendant's right to a fair trial. Requiring the use of an interpreter when necessary also ensures the accuracy and completeness of the trial record, and helps to preserve a defendant's rights in the event that he chooses to appeal. Allowing the district court the discretion to determine whether waiver is reasonable under the circumstances

---

[71] *Cf. Huang*, 960 F.2d at 1136 ("We are unable to conclude that the district court exercised sound discretion in [denying defendant's request for waiver]."); *see also Sims v. Blot* (*In re Sims*), 534 F.3d 117, 131–32 (2008) (holding that a district court's finding that a party has waived a privilege is reviewed under the abuse-of-discretion standard, and defining the non-pejorative term of art "abuse of discretion"); *United States v. Johnson*, 248 F.3d 655, 664 (7th Cir. 2001) ("[U]nder the CIA, the appointment of an interpreter as a constitutional matter is within the district court's discretion.").

[72] *Moon*, 718 F.2d at 1231.

presented is the best way to preserve the animating principles of the Sixth Amendment.

The CIA already takes this approach. It permits a defendant to waive the use of an interpreter, but it makes the waiver contingent on the informed discretion of the presiding judge.[73] A defendant's ability to waive the right to an interpreter at trial or in the course of related proceedings is not absolute, and a district judge faced with a request for a waiver must weigh a defendant's wishes against the need for an interpreter in order to safeguard the defendant's right to a fair and speedy trial and the public's right to a comprehensible trial.

### 2. The District Court did not abuse its discretion

We now turn to whether the District Court in this case abused its discretion by requiring that Henry use a court-appointed interpreter throughout the trial and use a standby interpreter while he testified in English. We conclude that the District Court did not abuse its discretion.

The District Court engaged in an extensive colloquy with both Henry and defense counsel to ascertain the need for an interpreter. It found that Henry had a working knowledge of English, but had trouble with more technical language, requiring Henry's lawyer to frequently repeat the more complex phrases for him during trial

---

[73] *See* 28 U.S.C. 1827(f)(1) ("Any individual other than a witness who is entitled to interpretation . . . may waive such interpretation in whole or in part. Such a waiver shall be effective only if approved by the presiding judicial officer . . . .").

preparation. This finding was supported by the record. Henry had used a court-appointed interpreter at every court proceeding until just before trial, when he requested to proceed without one. Henry's lawyer informed the District Court that Henry's primary language was Mandarin. He admitted his client spoke "good English," but not "great English."[74] Defense counsel also expressed concern that his client would not understand some of the concepts elicited at trial if he was permitted to proceed without the use of an interpreter. When questioned by the District Court, the defendant likewise conceded that some of the technical terms used at trial might be difficult for him to understand in light of his limited English language competence.

The District Court considered solving this problem by having defense counsel quietly explain to his client various complex concepts as they came up at trial. It concluded, however, that such a procedure would cause unnecessary delay. It also concluded that permitting Henry the intermittent use of a standby interpreter would be impracticable, as the witness would have to repeat previously given testimony for the interpreter every time the defendant indicated that he did not understand what had been said.

The District Court ultimately required the use of an interpreter throughout the trial with one exception: Henry was permitted to testify in English, with the ability to call on an interpreter if he could not understand a question or clearly articulate his response. The District Court hoped that this compromise would assuage Henry's

---

[74] A69.

concern that testifying with an interpreter would somehow prejudice the jury against him. Henry did testify in English, and he indeed required the use of an interpreter on several occasions during his testimony.

The District Court respected Henry's desire to invoke his waiver and fashioned an appropriate compromise solution. The District Court also clearly and properly instructed the jury that they were to draw no adverse inference from the fact that the defendant occasionally required the use of an interpreter.

The District Court's handling of this complex question was careful and thoughtful. It properly balanced Henry's wishes against the need for the jury and the public to understand the defendant's testimony, ensuring that he was afforded a fair trial.

## CONCLUSION

To summarize, we hold that:

(1) the Arms Control Export Act is not an unconstitutional delegation of legislative authority to the executive;

(2) the District Court's instructions to the jury on "willfulness" and "conscious avoidance" were not error;

(3) a defendant's right to waive the use of a court-appointed interpreter under the Court Interpreters Act is not absolute;

34

(4) the District Court's decision to place reasonable restrictions on Henry's request for a waiver did not violate his Sixth Amendment rights; and

(5) the District Court did not abuse its discretion in requiring that Henry be provided the assistance of a court-appointed Mandarin interpreter throughout trial.

For the reasons set out above, we **AFFIRM** the judgment of the District Court.